[L.A. No. 31564. Dec. 20, 1982.]

PACIFIC LEGAL FOUNDATION et al., Plaintiffs and Appellants, v. CALIFORNIA COASTAL COMMISSION et al., Defendants and Respondents.

E. WILLIAM JACKSON et al., Plaintiffs and Respondents, v. CALIFORNIA COASTAL COMMISSION, Defendant and Appellant.

**COUNSEL**

Ronald A. Zumbrun, Harold J. Hughes, Thomas E. Hookano, Elleene A. Kirkland, Howard E. Susman and Darlene E. Ruiz for Plaintiffs and Appellants and for Plaintiffs and Respondents.

Sanford Jay Rosen, Rosen & Remcho, Catherine P. Rosen, Heller, Ehrman, White & McAuliffe, Pillsbury, Madison & Sutro, Noble K. Gregory, Robert M. Westberg, Kevin M. Fong, O'Neill & Huxtable, Hill, Farrer & Burrill, John N. McLaurin, Herman H. Fitzgerald, Gary R. Rinehart, Oliver, Stoever & Laskin, Redwine & Sherrill, Justin M. McCarthy, Ogle, Gallo & Merzon, Thorpe, Sullivan, Workman & Thorpe, Roger Sullivan, Desmond, Miller, Desmond & Bartholomew, Richard F. Desmond, Asaro & Keagy, Roscoe D. Keagy, Dankert & Kuetzing, Thomas M. Dankert, Richard L. Johnson and Renee C. Benjamin as Amici Curiae on behalf of Plaintiffs and Appellants and Plaintiffs and Respondents.

George Deukmejian, Attorney General, N. Gregory Taylor, Assistant Attorney General, Peter H. Kaufman and Richard D. Sinclair, Deputy Attorneys General, for Defendant and Appellant and for Defendants and Respondents.

Mark I. Weinberger, Alletta D'A. Belin, E. Clement Shute, Jr., Shute, Mihaly & Weinberger, Michael B. Wilmar, Alan Pendleton, Frank Broadhead and Jonathan Smith as Amici Curiae on behalf of Defendant and Appellant and Defendants and Respondents.

OPINION

MOSK, J.—In recent decades, the People of California have become painfully aware of the deterioration in the quality and availability of recreational opportunities along the California coastline due to the combined factors of an increasing demand for its use and the simultaneous decreasing supply of accessible land in the coastal zone. Growing public consciousness of the finite quantity and fragile nature of the coastal environment led to the 1972 passage of Proposition 20, an initiative measure entitled the California Coastal Zone Conservation Act (the 1972 Coastal Act). (Former Pub. Resources Code, §§ 27000-27650.)

The 1972 Coastal Act created the California Coastal Zone Conservation Commission and directed it to oversee the orderly process of planning for the future development of the California coastline. The 1972 Coastal Act paralleled earlier legislation establishing state-supervised regional planning agencies for the protection of San Francisco Bay (Gov. Code, § 66600 et seq.) and Lake Tahoe (Gov. Code, § 67000 et seq.).

One of the stated purposes of the 1972 Coastal Act was to increase public access to the coast.[1] The 1972 Coastal Act was an interim measure, destined by its own terms to expire at the beginning of 1977. It authorized the interim coastal commission to prepare a study summarizing the progress of planning in the coastal zone and delineating goals and recommendations for the future of California's shoreline for the guidance of the Legislature. The study, labeled

---

[1]The ballot argument in support of the measure stated: "Our coast has been plundered by haphazard development and land speculation. Beaches formerly open for camping, swimming, fishing and picnicking are closed to the public. Campgrounds along the coast are so overcrowded that thousands of Californians are turned away." (See also *CEEED* v. *California Coastal Zone Conservation Com.* (1974) 43 Cal.App.3d 306, 321-322 [118 Cal. Rptr. 315].) Statements in ballot arguments in support of a successful initiative measure are properly considered as evidence of the intent behind the measure. (E.g., *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245-246 [149 Cal.Rptr. 239, 583 P.2d 1281].)

The 1972 Coastal Act expressly authorized the Coastal Commission to utilize its permit approval power as a lever to pry access easement dedications from landowners desiring to develop their coastal properties. Former Public Resources Code section 27403 provided in part: "All permits shall be subject to reasonable terms and conditions in order to ensure: (a) Access to publicly owned or used beaches, recreation areas, and natural reserves is increased to the maximum extent possible by appropriate dedication."

the California Coastal Plan, was completed in December 1975 and submitted to the Legislature, which used it as a guide when drafting the California Coastal Act of 1976 (the Coastal Act). (Pub. Resources Code, § 30000 et seq.) The Coastal Act created the California Coastal Commission (the Commission) to succeed the California Coastal Zone Conservation Commission. One of the objectives of the 1976 version of the Coastal Act was to preserve existing public rights of access to the shoreline and to expand public access for the future. The coastal commission was directed to prepare a set of guidelines explaining its interpretation of the public access provisions of the Coastal Act. (Pub. Resources Code, § 30620, subd. (a)(3).)[2]

Since the passage of the 1972 Coastal Act, both coastal commissions have adhered to a policy of requiring potential developers to dedicate easements through their property as a precondition to obtaining permit approval for proposed developments. Predictably, property owners have opposed the imposition of such conditions, occasionally resorting to litigation to express their dissatisfaction with the Commission's access policies. The present proceeding derives from two suits filed against the current Commission: one is an action filed by the Pacific Legal Foundation and a group of coastal property owners seeking a declaratory judgment, an injunction, and a writ of mandamus to correct the asserted facial invalidity of the Commission's public access guidelines; the other is an action for administrative mandamus filed by two property owners (Jackson and Hunter) seeking to compel the Commission to strike a specific permit condition.

Pacific Legal Foundation's suit did not challenge any individual permit condition; rather, it attacked the general access policies of the Commission. When the guidelines were adopted, the Pacific Legal Foundation amended its complaint to challenge the policies embodied therein. The apparent goal of the suit was to severely restrict the use of dedication conditions as a mechanism for fulfilling the Commission's obligation to maximize public access to the coast. The court denied the relief requested, and entered summary judgment for the Commission.

The action filed by Jackson and Hunter, in contrast, arose out of a disagreement with the Commission over the proper application of the Coastal Act's ac-

---

[2]That section provides: "[T]he commission shall, consistent with the provisions of this chapter [Pub. Resources Code, §§ 30600-30627], prepare interim procedures for the . . . review . . . of coastal development permit applications . . . . Such procedures shall include . . . (3) Interpretive guidelines designed to assist local governments, the regional commissions, the commission, and persons subject to the provisions of this chapter in determining how the policies of this division [the Coastal Act] shall be applied in the coastal zone prior to certification of local coastal programs; provided however, that such guidelines shall not supersede, enlarge, or diminish the powers or authority of any regional commission, the commission, or any other public agency."

cess provisions to a particular permit application. The two named plaintiffs were coowners of a parcel of land abutting on the Pacific Ocean, in the Mussel Shoals area of Ventura County. The western boundary of the property is the line of mean high tide. From that line, for a distance of approximately 100 to 140 feet in an easterly direction, the parcel consists of a sandy beach. At the edge of the beach there is a subsurface revetment or seawall, adjacent to a single-family residence.

During unusually severe winter storms in early 1978, high waves threatened to damage the residence. To protect their property, the owners improved the existing seawall by adding armour rock below the sandy surface. Subsequently, the Commission notified them that a permit was required for the repairs that had been made. The owners ultimately applied for a permit, which was granted on condition that they dedicate a lateral easement for public access across the entire sandy beach from the line of mean high tide to the toe of the seawall.

The property owners challenged the permit condition by petitioning for a writ of administrative mandamus in the superior court. (See Pub. Resources Code, § 30801; Code Civ. Proc., § 1094.5.) The court granted the writ, finding that the improved seawall was necessary to protect the residence from the ocean. It also found that the area where the improvements were made was stable because the beach was accreting, i.e., accumulating sand as it advanced seaward. The seawall had no adverse impact on the supply of sand to the beach, and it did not interfere in any way with the natural processes in the shorezone. Finally, the court found the evidence insufficient to support the Commission's finding that the seawall improvement adversely affected public access to or across the beach. Legal support for the court's grant of mandamus is found in Public Resources Code section 30235, which specifically allows the construction of seawalls to protect existing structures, and in Public Resources Code section 30212, subdivision (b), which provides exemptions from the access requirements of the Coastal Act for repairs and improvements that do not adversely impact on public access.

The Commission appealed from the ruling, but then moved for a dismissal with prejudice after the completion of briefing (see Cal. Rules of Court, rule 19(b)) and admitted in a letter to the Court of Appeal that "the evidence in that record was not, upon further reflection, sufficient to support the imposition of such [an access] condition given [the Commission's] present interpretation of the public access requirements of the Coastal Act."

Attorneys for the Pacific Legal Foundation, which was representing Jackson and Hunter as their appellate counsel, stated in a letter to the Court of Appeal that they would not oppose the dismissal; however, they explained that they intended to file a post-dismissal motion for attorney fees under Code of Civil Pro-

cedure section 1021.5. The appeal was dismissed and the remittitur issued. The Court of Appeal later recalled the remittitur, consolidated the motion for attorney fees in *Jackson* with the pending appeal in *Pacific Legal Foundation,* and issued a single opinion disposing of the motion for fees and the merits of *Pacific Legal Foundation.* We then granted a hearing to examine the validity of the Commission's access guidelines.

### I.

### *Jackson* v. *California Coastal Commission*

Before proceeding to the merits, it is necessary to discuss at 'the outset whether the motion for attorney fees was properly before the Court of Appeal. Pacific Legal Foundation first requested attorney fees under section 1021.5 on November 11, 1981, in its letter responding to the Commission's motion to dismiss the appeal. Dismissal was ordered on December 16, 1981, and the remittitur issued on December 24. On January 1, 1982, Pacific Legal Foundation submitted a formal motion for fees but was informed by the clerk that the remittitur had already issued. The following day, the remittitur was recalled and the motion was filed. ██ Subsequently, the *Jackson* case was consolidated with *Pacific Legal Foundation.*[3]

The legal principles applicable to the recall of remittiturs are fairly well settled. ██ "Other than for the correction of clerical errors, the recall may be ordered on the ground of fraud, mistake or inadvertence. The recall may not be granted to correct judicial error. . . . [A] decision is inadvertent if it is the result of oversight, neglect or accident, as distinguished from judicial error." (*Southwestern Inv. Corp.* v. *City of L.A.* (1952) 38 Cal.2d 623, 626 [241 P.2d 985].) "[W]hile the general rule is that an appellate court loses all control and jurisdiction over a cause after remittitur has been issued, a mistake or an improvident act which results in prejudicial error or miscarriage of justice may nevertheless be corrected upon a recall of remittitur." (*In re Martin* (1962) 58

---

[3]The decision by the Court of Appeal to consolidate the two cases is troubling. The cases raised fundamentally different issues; their only similarity seems to have been that the Commission was a party and the Pacific Legal Foundation an appellate counsel in both cases. *Jackson* was a specific challenge to a dedication condition imposed as a prerequisite to approval of an application for a permit to validate a completed seawall improvement. The condition was imposed prior to the adoption of the access guidelines challenged in *Pacific Legal Foundation.* Moreover, whatever superficial similarity may have initially existed between the issues in both cases had vanished by the time of consolidation. The validity of the permit condition imposed on Jackson and Hunter was no longer in dispute; the parties' only remaining bone of contention was the availability of attorney fees. Therefore, it was improper for the Court of Appeal to consolidate the two cases, as they shared no common issues. Nonetheless, both causes are before us after the grant of a hearing, and it would serve no discernible purpose to bifurcate the proceeding now. We therefore take the most efficient course by disposing of both matters by a single opinion, being careful not to consider the facts of *Jackson* when analyzing the distinct issues presented in *Pacific Legal Foundation.*

Cal.2d 133, 138 [23 Cal.Rptr. 167, 373 P.2d 103]; see also *In re McGee* (1951) 37 Cal.2d 6, 8-9 [229 P.2d 780] [recall of remittitur appropriate to remedy incorrect award of costs].) Here, the issuance of the remittitur prior to the dispositon of Pacific Legal Foundation's motion for fees was entirely accidental; the record and the declaration of the clerk of the Court of Appeal make that fact clear. Hence, the order recalling the remittitur was the appropriate procedural mechanism to correct the clerical error.

■ The Commission does not dispute that the remittitur was properly recalled, but instead argues that the dismissal of the appeal divested the Court of Appeal of jurisdiction over the cause, preventing it from ruling on the motion for attorney fees. However, the recall of the remittitur had the effect of reinstating the court's jurisdiction over the appeal, rendering disposition of the motion appropriate. The situation is analogous to an appellate court's retention of jurisdiction over the question of attorney fees after the final disposition of the merits of an appeal. (*Serrano* v. *Priest* (1976) 18 Cal.3d 728, 777 [135 Cal.Rptr. 345, 557 P.2d 929]; see also *Mack* v. *Younger* (1980) 27 Cal.3d 687 [165 Cal.Rptr. 876, 612 P.2d 966].) Although the question of the appropriateness of an award of attorney fees to the prevailing party on an appeal should normally be disposed of in conjunction with a decision on the merits of the appeal, we have no doubt that an appellate court may properly dispose of a motion for attorney fees separately if that procedure is deemed more expeditious, in those relatively rare instances in which the appeal is dismissed on motion of the appellant.

■ We next address the question whether plaintiffs are entitled to an award of appellate attorney fees under the "private attorney general" theory codified in Code of Civil Procedure section 1021.5. That section allows a court to award fees to a party if (1) the action "has resulted in the enforcement of an important right affecting the public interest"; (2) "a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons"; (3) "the necessity and financial burden of private enforcement are such as to make the award appropriate"; and (4) "such fees should not in the interest of justice be paid out of the recovery, if any." We first applied section 1021.5 in *Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 932-942 [154 Cal.Rptr. 503, 593 P.2d 200]. There, the trial court made no ruling on the applicability of section 1021.5 because that provision had not yet been adopted when the court acted on the plaintiffs' motion for attorney fees. We remanded the cause to the trial court to make the factual determination whether the statutory prerequisites to a fee award were present.

In the case at bar, the dismissal of the Commission's appeal obviated the need for any further action on the merits of *Jackson* by the Court of Appeal. That court's sole substantive ruling was that Pacific Legal Foundation should

recover the value of its services as appellate counsel. Trial counsel had requested fees only under Government Code section 800, however, and the trial court therefore made no findings on the existence of the criteria of section 1021.5. Yet, because the present record establishes as a matter of law that plaintiffs are not entitled to attorney fees under the latter statute, there is no need to prolong this proceeding by remanding it to the trial court for a factual ruling on the availability of such fees.

The record demonstrates that the primary effect of the judgment was to invalidate the particular permit condition imposed in light of the limited facts of *Jackson*. The court granted a writ of administrative mandamus because the findings of the Commission forming the basis for the exaction in question were not supported by substantial evidence. Specifically, the court found that evidence was lacking to support the Commission's finding that the installation of armour rock in front of the plaintiffs' seawall would either adversely impact on public access along the beach or affect the natural shoreline processes in the area; it was clear that the boundary between land and sea was located a substantial distance from the revetment in question. The court also concluded, on the basis of the absence of evidence to support the Commission's factual determinations, that the permit condition effected an unconstitutional taking of an interest in plaintiffs' property.

Although we have no doubt that the right to be free from the deprivation of private property interests in an arbitrary manner may rise to the level of an "important right affecting the public interest," it is equally plain that the grant of administrative mandamus under the limited factual circumstances shown here did not result in conferring a "significant benefit" on a "large class of persons." The decision vindicated only the rights of the owners of a single parcel of property. It in no way represents, for example, a ringing declaration of the rights of all or most landowners in the coastal zone, nor will it "certainly lead to the Commission's abandoning its prior unconstitutional practices of conditioning statutorily authorized permits upon an individual's surrender of his private property," as the plaintiffs contend. It is more likely that the Commission will heed the decision simply by striking conditions imposed under similar factual circumstances. We conclude that plaintiffs are not entitled to appellate attorney fees under section 1021.5.

## II.

### *Pacific Legal Foundation* v. *California Coastal Commission*

The parties differ sharply in their views on the meaning and validity of the guidelines, but they both urge us to reach the merits of this proceeding. ■ Referring to the facts of several pending cases challenging particular permit conditions, plaintiffs contend that the continuing application of the policies em-

bodied in the guidelines is in issue; alternatively, they argue that their facial challenge to the validity of the guidelines is by itself a sufficient "actual controversy" admitting of declaratory relief. The Commission adopts the position that although declaratory relief is unavailable because no actual controversy exists, administrative mandamus is nonetheless an appropriate remedy. As will appear, neither of these positions is wholly acceptable.

 Initially, we may dispose of the Commission's argument that administrative mandamus is an appropriate remedy for testing the validity of administrative regulations in the abstract. The Legislature obviously intended that a wide range of persons be able to enforce the provisions of the Coastal Act through the mechanism of petitioning for a writ of administrative mandamus. Public Resources Code section 30801 creates broad standing to bring such actions, expressly referring to Code of Civil Procedure section 1094.5. Section 30801 provides in pertinent part: "Any aggrieved person shall have a right to judicial review of any decision or action of the commission . . . by filing a petition for a writ of mandate in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure . . . . [¶] For purposes of this section . . ., an 'aggrieved person' means any person who, in person or through a representative, appeared at a public hearing of the commission . . . in connection with the decision or action appealed, or who, by other appropriate means prior to a hearing, informed the commission . . . of the nature of his concerns . . . ."

The Commission maintains that its adoption of the guidelines was a "decision or action" within the meaning of section 30801, and is thus reviewable under section 1094.5. This contention overlooks the well-settled rule that administrative mandamus is not available to review quasi-legislative actions of administrative agencies. (E.g., *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34, fn. 2 [112 Cal.Rptr. 805, 520 P.2d 29]; *City of Coronado* v. *California Coastal Zone Conservation Com.* (1977) 69 Cal.App.3d 570, 573-574 [138 Cal.Rptr. 241]; see also 5 Witkin, Cal. Procedure (2d ed. 1971) Extraordinary Writs, § 215(2), p. 3971; Cal. Admin. Mandamus (Cont.Ed.Bar 1966) § 2.8, pp. 17-18.)

The action under consideration—adoption of guidelines interpreting the Coastal Act's access provisions—unquestionably falls within the category of quasi-legislative agency action, as opposed to quasi-judicial or adjudicatory proceedings. (See generally *Horn* v. *County of Ventura* (1979) 24 Cal.3d 605, 612-614 [156 Cal.Rptr. 718, 596 P.2d 1134]; *San Diego Bldg. Contractors Assn.* v. *City Council* (1974) 13 Cal.3d 205, 212-213 [118 Cal.Rptr. 146, 529 P.2d 570, 72 A.L.R.3d 973].) The guidelines are the formulation of a general policy intended to govern future permit decisions, rather than the application of rules to the peculiar facts of an individual case. Quasi-legislative acts are

reviewable only by an action for declaratory relief (Code Civ. Proc., § 1060) or for traditional mandamus (*id.*, § 1085). (E.g., *Clean Air Constituency* v. *California State Air Resources Bd.* (1974) 11 Cal.3d 801, 809 [114 Cal.Rptr. 577, 523 P.2d 617]; *Toso* v. *City of Santa Barbara* (1980) 101 Cal.App.3d 934, 943 [162 Cal.Rptr. 210]; *Viso* v. *State of California* (1979) 92 Cal.App.3d 15, 22 [154 Cal.Rptr. 580]; Cal. Civil Writs (Cont.Ed.Bar 1970) § 5.37, p. 89.) Public Resources Code section 30803 specifically makes declaratory and injunctive relief broadly available to review possible violations of the Coastal Act;[4] section 30804 seems to envision the use of traditional mandamus.[5]

 In any event, a basic prerequisite to judicial review of administrative acts is the existence of a ripe controversy. Plaintiffs have attempted to meet this requirement by referring to the facts of a number of other cases now pending in the superior courts and Courts of Appeal of this state. One case has even resulted in a published opinion. (*Georgia-Pacific Corp.* v. *California Coastal Com.* (1982) 132 Cal.App.3d 678 [183 Cal.Rptr. 395].) They also listed in their complaint the names of several landowners who had in the past acceded to exactions similar to those imposed on Jackson and Hunter. Concededly, those cases involve the imposition of particular dedication conditions; however, they are relevant to the present case only in the general sense that they indicate the guidelines are actually being applied by the Commission. The particular facts of and the contentions made in those cases are not before us, and it would be improper to review and discuss them to support our decision on the merits of the instant case. Furthermore, the record clearly reveals that plaintiffs have argued throughout this proceeding that no specific application of the guidelines is involved; rather, the case is merely a general challenge on statutory and constitutional grounds to the Commission's access policies contained in the guidelines. In fact, plaintiffs' attorneys expressly declined the trial court's offer to introduce evidence concerning the application of the guidelines. Therefore, we

---

[4]Section 30803 states in part: "Any person may maintain an action for declaratory and equitable relief to restrain any violation of this division [the Coastal Act]." It parallels Government Code section 11350, which makes declaratory relief generally available to review administrative regulations. Section 11350 has no application to the guidelines, however, because the Legislature specifically exempted the guidelines from the provisions of the California Administrative Procedure Act. (Gov. Code, § 11340 et seq.) The guidelines were authorized under Public Resources Code section 30620, subdivision (a)(3). However, the Legislature also enacted Public Resources Code section 30333, which provides that "the commission may adopt rules and regulations to carry out the purposes and provisions of this division [the Coastal Act], and to govern procedures of the commission. [¶] *Except as provided in . . . paragraph (3) of subdivision (a) of Section 30620,* these rules and regulations shall be adopted in accordance with the provisions of [the Administrative Procedure Act]." (Italics added.)

[5]Section 30804 declares: "Any person may maintain an action to enforce the duties specifically imposed upon the commission, any regional commission, any governmental agency, any special district, or any local government by this division [the Coastal Act]." It appears designed in part to make traditional mandamus available to enforce ministerial duties imposed on the Commission by the Coastal Act.

must evaluate the question of ripeness in light of the fact that this proceeding is a facial challenge to the guidelines and nothing more.

Although it did not identify the issue as such, the trial court grappled with the problem of ripeness and eventually concluded that it could not decide the validity of the guidelines except when faced with a specific exaction.[6] The parties appear anxious to have us ignore it, but the ripeness problem remains. In order to reach the merits of plaintiffs' challenges to the guidelines, we must first determine that the issues raised are sufficiently concrete to allow judicial resolution even in the absence of a precise factual context.

■ The ripeness requirement, a branch of the doctrine of justiciability, prevents courts from issuing purely advisory opinions. (See generally *People ex rel. Lynch* v. *Superior Court* (1970) 1 Cal.3d 910 [83 Cal.Rptr. 670, 464 P.2d 176].) It is rooted in the fundamental concept that the proper role of the judiciary does not extend to the resolution of abstract differences of legal opinion. It is in part designed to regulate the workload of courts by preventing judicial consideration of lawsuits that seek only to obtain general guidance, rather than to resolve specific legal disputes. However, the ripeness doctrine is primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy. On the other hand, the requirement should not prevent courts from resolving concrete disputes if the consequence of a deferred decision will be lingering uncertainty in the law, especially when there is widespread public interest in the answer to a particular legal question. (*Stocks* v. *City of Irvine* (1981) 114 Cal.App.3d 520, 533 [170 Cal.Rptr. 724]; *Central Valley Chap. 7th Step Foundation* v. *Younger* (1979) 95 Cal.App.3d 212, 232 [157 Cal.Rptr. 117]; *California Water & Telephone Co.* v. *County of Los Angeles* (1967) 253 Cal.App.2d 16, 26 [61 Cal.Rptr. 618]; cf. *Winter* v. *Gnaizda* (1979) 90 Cal.App.3d 750, 756 [152 Cal.Rptr. 700]; *Zetterberg* v. *State Dept. of Public Health* (1974) 43 Cal.App.3d 657, 662 [118 Cal.Rptr. 100].)

A logical starting point for a discussion of the concept of ripeness is the following general statement from *Aetna Life Ins. Co.* v. *Haworth* (1937) 300 U.S. 227, 240-241 [81 L.Ed. 617, 621, 57 S.Ct. 461, 108 A.L.R. 1000]: "The

---

[6]The trial judge at one point remarked: "I suppose it might be theoretically possible that the literal application of the policy guidelines to some theoretical fact situation could result in someone being deprived of their property rights. But in all of the fact situations that I have conjured up in my own mind and have been suggested seem to have been provided either by legislative exception or by flexibility in the guidelines themselves. In other words, don't we get back to the same place that we should make a determination on an individual case basis?" Later, when denying plaintiffs' motion for summary judgment, the judge reiterated his concern with the problem of ripeness: "I think the question of whether the application of these guidelines would be contrary to the legislative mandate or to the constitution is something that must be left to an individual case."

controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. [Citation.] It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." A similar statement is found in *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 117 [109 Cal.Rptr. 799, 514 P.2d 111], in which we discussed the availability of declaratory relief under Code of Civil Procedure section 1060: "The 'actual controversy' referred to in this statute is one which admits of definitive and conclusive relief by judgment within the field of judicial administration, as distinguished from an advisory opinion upon a particular or hypothetical state of facts. The judgment must decree, not suggest, what the parties may or may not do." (See also *Columbia Pictures Corp.* v. *De Toth* (1945) 26 Cal.2d 753, 760 [161 P.2d 217, 162 A.L.R. 747].) In the same vein, the Court of Appeal has observed: "The principle that courts will not entertain an action which is not founded on an actual controversy is a tenet of common law jurisprudence, the precise content of which is difficult to define and hard to apply. . . . A controversy is 'ripe' when it has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made." (*California Water & Telephone Co.* v. *County of Los Angeles* (1967) 253 Cal.App.2d 16, 22 [61 Cal.Rptr. 618].)

■ The federal courts have frequently addressed the issue of ripeness in the precise context here presented—an attempt to obtain review of the propriety of administrative regulations prior to their application to the party challenging them. (See Davis, Administrative Law Treatise (1970, 1976 & 1982 Supps.) §§ 21.00, 21.06.) The approach that has developed is summed up in the following passage from *Abbott Laboratories* v. *Gardner* (1967) 387 U.S. 136, 148-149 [18 L.Ed.2 681, 691, 87 S.Ct. 1507]: "The injunctive and declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy 'ripe' for judicial resolution. Without undertaking to survey the intricacies of the ripeness doctrine it is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. *The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.*" (Fn. omitted; italics added.)

In *Abbott*, a group of drug manufacturers sought judicial review of federal regulations governing the labeling of drugs. The regulations were promulgated

to interpret a federal statute governing such labeling. The court found that "the impact of the regulations upon the petitioners is sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage." (*Id.* at p. 152 [18 L.Ed.2d at p. 693].) It pointed out that the case presented only clear-cut legal issues. Further, the interpretive regulations would, if followed, require significant changes in the day-to-day conduct of the pharmaceutical business. The manufacturers were forced to choose at once between complying with regulations of questionable validity and risking civil and criminal penalties. Therefore, the court decided not to defer a decision on the validity of the regulations. (For cases applying the analysis of *Abbott,* see, e.g., *Continental Air Lines, Inc.* v. *C. A. B.* (D.C. Cir. 1974) 522 F.2d 107, 124-128; *Phillips Petroleum Co.* v. *Federal Power Com'n* (10th Cir. 1973) 475 F.2d 842, 847-848.)

Under the federal approach, plaintiffs' posture lacks the urgency and definiteness necessary to render declaratory relief appropriate. Although their constitutional claims are impossible to weigh in the abstract,[7] their main contentions relate to the narrower question whether the guidelines reasonably interpret the public access portions of the Coastal Act. It is true that the parties' interests are adverse, and the issues have been thoroughly addressed in the voluminous briefs on file. (See *Van Atta* v. *Scott* (1980) 27 Cal.3d 424, 450 [166 Cal.Rptr. 149, 613 P.2d 210]; *Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 270 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206].) Nonetheless, the abstract posture of this proceeding makes it difficult to evaluate even the issues relating to the consistency of the guidelines with the Coastal Act. Plaintiffs are in essence inviting us to speculate as to the type of developments for which access conditions might be imposed, and then to express an opinion on the validity and proper scope of such hypothetical exactions. We decline to enter into such a contrived inquiry. On balance, it does not appear that the first prong of the *Abbott* test is satisfied: the issues are not yet appropriate for immediate judicial resolution.

The second test, i.e., "the hardship to the parties of withholding court consideration," is also not met. Coastal landowners are not immediately faced with the dilemma of either complying with the guidelines or risking penalties for

---

[7]In the context of regulations limiting land use, several cases have recognized that when a particular statute or ordinance is said to effect an unconstitutional taking of private property, the claim is best examined by reference to a specific set of facts. In *Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266 [157 Cal.Rptr. 372, 598 P.2d 25], affirmed 447 U.S. 255 [65 L.Ed.2d 106, 100 S.Ct. 2138], for example, we referred to "the general proposition that whether a regulation is excessive in any particular situation involves questions of degree, turning on the individual facts of each case . . . ." (*Id.,* at p. 277; see also *Kaiser Aetna* v. *United States* (1979) 444 U.S. 164, 175 [62 L.Ed.2d 332, 343, 100 S.Ct. 383]; *Pennsylvania Coal Co.* v. *Mahon* (1922) 260 U.S. 393, 413 [67 L.Ed. 322, 325, 43 S.Ct. 158, 28 A.L.R. 1321].)

violating them; that situation will not arise unless and until they apply for a development permit and suffer the imposition of invalid dedication conditions. As far as the parties to this action are concerned, the most significant effect of the guidelines thus far has been to generate a difference of opinion as to their validity, and that is obviously not enough by itself to constitute an actual controversy. (*Winter* v. *Gnaizda, supra,* 90 Cal.App.3d 750, 756; *Zetterberg* v. *State Dept. of Public Health, supra,* 43 Cal.App.3d 657, 663.) The presence of the guidelines may tend to inhibit property owners from planning improvements on their land because of the possibility that they will have to comply with access conditions, should they apply for a development permit. However, the hardship inherent in further delay is not imminent or significant enough to compel an immediate resolution of the merits of plaintiffs' claims, at least under the federal standards.[8]

Our decision in *Selby Realty Co.* v. *City of San Buenaventura, supra,* 10 Cal.3d 110, supports this analysis. In *Selby,* the county had adopted by ordinance a general plan designating a street to be built across certain property. The owner of the property was denied a building permit by the city because he refused to dedicate land for construction of the street. We held that he could not maintain an action for declaratory relief against the county, whose only action had been the adoption of a general plan showing a street to be located on his land. The plaintiff had sought a declaration that the adoption of the plan, without more, constituted a taking of his property without due process of law. We instructed him to await implementation of the plan through the institution of condemnation proceedings against him. However, we considered on the merits his action for administrative mandamus to review the city's permit denial.

Plaintiffs argue that *Selby* is distinguishable; they point out that adoption of a general land use plan is different from the adoption of interpretive guidelines because a general plan requires legislative implementation through the passage of zoning ordinances, whereas the guidelines require only administrative implementation through the permit decisions of the Commission. The suggested distinction consists more of shadow than of substance.

The primary concern expressed in *Selby* was that courts not be drawn into disputes which depend for their immediacy on speculative future events. Con-

---

[8]Referring to a number of First Amendment cases (see, e.g., *People* v. *Glaze* (1980) 27 Cal.3d 841 [166 Cal.Rptr. 859, 614 P.2d 291]; *People* v. *Fogelson* (1978) 21 Cal.3d 158 [145 Cal.Rptr. 542, 577 P.2d 677]), plaintiffs speciously contend that facial review of the guidelines is appropriate because the mere presence of the guidelines chills the exercise of constitutionally protected private property rights. The cited cases are entirely inapposite; they rest on the traditional preferred place of the First Amendment in our system of government and the fragile nature of First Amendment rights. It would require truly contorted logic to extend them to the land use context.

trary to the implication of plaintiffs' argument, the fact that the general plan may have required legislative, as opposed to administrative, implementation was irrelevant to our decision. We emphasized, instead, that the challenged plan had not been implemented at all: "The plan is by its very nature merely tentative and subject to change. Whether eventually any part of plaintiff's land will be taken for a street depends upon unpredictable future events. If the plan is implemented by the county in the future in such manner as actually to affect plaintiff's free use of his property, the validity of the county's action may be challenged at that time." (*Id.* at p. 118.) The plaintiff in *Selby* thus could allege no direct and immediate effects on the use of his land arising from the mere adoption of the general plan; he was simply anticipating that the plan would someday be implemented at his expense.

Here also, plaintiffs' claim of injury depends for its urgency on the supposition that some of them will in the future desire to make improvements on their land requiring a permit from the Commission, that the Commission will condition permit approval on the dedication of access easements, and that the conditions imposed will violate either the provisions of the Coastal Act or constitutional protections of private property. Although it may be predicted with assurance that some of the plaintiff landowners will eventually wish to make improvements on their property, it is sheer guesswork to conclude that the Commission will abuse its authority by imposing impermissible conditions on any permits required. The guidelines are not mandatory. They do not require the Commission to impose access conditions in any particular circumstances, but rather adopt a flexible approach: the Commission is to determine the appropriateness of access exactions on a case-by-case basis. Thus, the potential effects of the guidelines are even less concrete than those of the general plan at issue in *Selby.* If the Commission does impose questionable conditions, the affected landowners may of course pursue their remedy of a petition for writ of administrative mandamus to review the factual and legal bases for the conditions imposed, as did Jackson and Hunter. (See also *Georgia-Pacific Corp.* v. *California Coastal Com., supra,* 132 Cal.App.3d 678; see generally Pub. Resources Code, § 30801; Code Civ. Proc., § 1094.5; *State of California* v. *Superior Court (Veta)* (1974) 12 Cal.3d 237, 248 [115 Cal.Rptr. 497, 524 P.2d 1281]; *Selby Realty Co.* v. *City of San Buenaventura, supra,* 10 Cal.3d 110, 123-124.)[9]

In *Jackson* the motion for attorney fees is denied. In *Pacific Legal Foundation* the judgment is affirmed.

---

[9]We must also reject plaintiffs' final contention that the guidelines are presently reviewable because they are incorrect and therefore in excess of the Commission's authority. (See Pub. Resources Code, § 30620, subd. (a)(3).) The claim begs the question whether the issue of the guidelines' correctness is ripe for decision.

Richardson, J., Kaus, J., Broussard, J., and White J.,* concurred.

Bird, C. J., and Reynoso, J., concurred in the judgment.

*Assigned by the Chairperson of the Judicial Council.