Filed 4/19/21; certified for publication 5/4/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| ALLIANCE FOR RESPONSIBLE PLANNING, | C085712 |
| Plaintiff and Appellant, | (Super. Ct. No. PC20160346) |
| v. | |
| TAYLOR et al., | |
| Defendants and Appellants; | |
| COUNTY OF EL DORADO et al., | |
| Defendants and Respondents. | |

Defendants Sue Taylor et al. (Taylor) appeal from a judgment granting in part plaintiffs Alliance for Responsible Planning's (Alliance) petition for a writ of mandate. On appeal, Taylor contends the trial court erred in (1) prematurely considering the facial challenge; (2) granting Alliance's petition as to certain policies implemented by Measure E; and (3) granting Alliance's petition as to Measure E's eighth implementation statement.

1

Alliance has also raised several protective contentions. As we affirm the judgment in the trial court, we need not reach those contentions. Defendants El Dorado County Board of Supervisors and County of El Dorado have also filed a brief on appeal.

We affirm the judgment.

FACTS AND PROCEDURAL HISTORY

Measure E

El Dorado County voters adopted Measure E in June 2016. Measure E's stated purpose was to end the practice of "paper roads." Prior to Measure E, if a project requiring discretionary approval would increase traffic beyond certain thresholds, the project could be approved so long as the developer contributed its proportional share of traffic impact fees to cover the cost of future road improvements, and so long as the necessary traffic-mitigating improvements were included in the County's 10- or 20-year (depending on the project type) Capital Improvement Program. Measure E sought to end the practice of developments going forward, while traffic-mitigating road improvements remained on paper.

As pertinent to this appeal, Measure E modified El Dorado County General Plan Policies TC-Xa 3 and TC-Xf as follows (we note that line outs are deletions, underlines are inclusions.) Measure E also amended several other General Plan policies and added four new policies. Unless noted, those changes, are not pertinent to this appeal.

*Policy TC-Xa 3:*

> "~~Developer paid traffic impact fees combined with any other available funds shall fully pay for building~~ All necessary road capacity improvements shall be fully completed to prevent ~~to fully offset and mitigate all direct and~~ cumulative traffic impacts from new development from reaching Level of Service F during peak hours upon any highways, arterial roads and their intersections during weekday, peak-hour periods in unincorporated areas of

2

the county <u>before any form of discretionary approval can be given to a project</u>."

"Level of service is a measure of traffic congestion at intersections, which ranges from A (little or no delay) to F (extreme traffic delay)." (*American Canyon Community United for Responsible Growth v. City of American Canyon* (2006) 145 Cal.App.4th 1062, 1080.) Policy TC-Xa 1 refers to Level of Service F as "gridlock, stop-and-go."

*Policy TC-Xf:*

"At the time of approval of a tentative map for a single family residential subdivision of five or more parcels that worsens (defined as a project that triggers Policy TC-Xe [A] or [B] or [C]) traffic on the County road system, the County shall ~~do one of the following: (1)~~ condition the project to construct all road improvements necessary to maintain or attain Level of Service standards detailed in this Transportation and Circulation Element based on existing traffic plus traffic generated from the development plus forecasted traffic growth at 10-years from project submittal~~; or (2) ensure the commencement of construction of the necessary road improvements are included in the County's 10 year CIP [Capital Improvement Program]~~.

"For all other discretionary projects that worsen (defined as a project that triggers Policy TC-Xe [A] or [B] or [C]) traffic on the County road system, the County shall ~~do one of the following: (1)~~ condition the project to construct all road improvements necessary to maintain or attain Level of Service standards detailed in this Transportation and Circulation Element~~; or (2) ensure the construction of the necessary road improvements are included in the County's 20 year CIP~~."

Measure E also provided nine statements under the heading, "Implementation." At issue here, the eighth implementation statement provided: "LOS [Level of Service]

3

traffic levels on Highway 50 on-off ramps and road segments shall be determined by Caltrans and fully accepted by the County for traffic planning purposes."

After Measure E passed, the El Dorado County's Chief Administrative Office, the County Counsel, and the Community Development Agency prepared a memo (County memo) addressing Measure E's potential impacts. The memo cited "a number of potential legal conflicts, ambiguities, and internal inconsistencies" in Measure E and made recommendations for ascertaining voter intent and resolving implementation issues.

As to policy TC-Xa 3, the memo cited two possible literal constructions. One being that before any discretionary project is approved, every road improvement needed to prevent gridlock — including over $400 million in programed traffic mitigation projects — must first be completed. This would entail a "de facto moratorium on all projects requiring some form of discretionary approval." It would also likely provoke unconstitutional takings claims litigation, the memo warned.

The memo went on to describe "[a] different, but still literal application," whereby discretionary approval would require a developer to first complete necessary road improvements addressing traffic "from their proposed development combined with other development in the future (i.e. 'cumulative') . . . ." Under this construction, discretionary projects not impacting traffic (cell towers, fence height variance, etc.) could be approved without completing road improvements.

The memo cautioned, however, that, "this approach does not resolve a potentially significant and insurmountable hurdle" for other discretionary projects. A small business, for example, proposing a commercial parcel generating enough vehicle trips that when combined with future development would trigger the need for major road infrastructure improvements, "would need to fully complete the improvement before its design review could be approved." And the County, for its part, could not legally, under *Dolan v. City of Tigard* (1994) 512 U.S. 374 [129 L.Ed.2d 304] (*Dolan*), condition approval on building improvements that far exceed the project's impact. "The only

4

alternative," the memo explained, "is for the small business to wait until the County or another private party fully completes the improvement."

The memo called both approaches problematic. It went on to explain that because a literal reading would lead to absurd or unconstitutional consequences, statutory construction must be employed. Calling TC-Xf the more specific policy, the memo proposed reading the more general TC-Xa 3 in light of TC-Xf.

To that, the memo concluded that TC-Xa 3's timing requirements "should be interpreted as a concurrency requirement rather than a strict condition precedent to discretionary action by the County." Thus, "rather than a literal interpretation of Measure E's TC-Xa 3," TC-Xa 3 would be applied such that satisfying TC-Xf would also satisfy TC-Xa 3.

The memo also noted that a pre-election impartial analysis prepared for Measure E, identified a potential inconsistency between TC-Xa 3 and TC-Xf. That analysis provided in part: "The effect of these amendments is unclear, in large part because the amendment to Policy TC-Xa — requiring completion of necessary road improvements *before* project approval — appears to conflict with the part of Policy TC-Xf left unchanged by this measure — allowing the County to approve a project so long as it conditions the project to construct the necessary road improvements."

The memo also cited an analysis by Measure E proponents, urging an interpretation ensuring, under *Dolan*, a rational nexus between a project's impact and the exactions imposed. The analysis went on to state: "discretionary projects that have no cumulative traffic impacts may not be conditioned or denied because necessary road capacity improvements have not been completed. The claim that this initiative language would prohibit discretionary approvals of any kind no matter how small is therefore completely unfounded." The analysis also explained that when read together with TC-Xf, discretionary approvals not contributing to cumulative traffic impacts would not be affected by Measure E.

5

As to TC-Xf, the memo explained that Measure E changes conditions of approval for new discretionary projects, requiring projects to construct specific road improvements rather than simply paying traffic impact mitigation fees. This would likely disproportionately affect small developments. While larger developments might phase in improvements and spread costs over many new homes and businesses, smaller developments would be problematic: "If such a project is projected to cause [a Level of Service] deficiency, and the County cannot legally condition the project to build the necessary improvement (because it fails the 'rough proportionality' test), the County will likely have to deny the project based on General Plan inconsistency."

The memo cited as an example, a project projected to "worsen" traffic (defined in the General Plan as increasing traffic 2 percent daily or at peak hours, adding at least 10 trips during peak hours, or adding 100 or more daily trips). That project could be conditioned to complete a necessary interchange improvement, but "[c]onditioning a project in this manner would likely fail the 'rough proportionality' requirement pursuant to *Dolan v. City of Tigard*[, *supra*,] 512 U.S.687." Alternatively, the developer could wait for the County or another private party to complete the interchange improvements.

The memo proposed redefining "worsen" in the General Plan to set a higher traffic threshold, so smaller projects could move forward, but noted the redefinition "would require a separate County-initiated General Plan amendment and associated environmental review."

Finally, as to implementation statement eight, requiring the county to "fully accept[]" Caltrans' determination of Highway 50 traffic, the memo concluded it was inconsistent with existing General Plan policy, and revising the General Plan policy to conform would be problematic. The memo explained that requiring the county to abdicate responsibility to Caltrans contravenes TC-Xd, which requires the County Department of Transportation to select the traffic analysis period for calculating Level of Service. "This is particularly important," the memo explained, "given that the County

6

typically focuses on weekday peak hour traffic volumes . . . whereas Caltrans often looks at the entire seven day week and/or annual average daily traffic."

The memo also noted that Caltrans Highway 50 Level of Service conclusions, include a disclaimer that they are not "intended to address design policies and procedures," and cited several conflicting traffic findings between the County and Caltrans. Describing Caltrans findings as "overstated," the memo concluded that conditioning projects to mitigate gridlock conditions on unsubstantiated Highway 50 findings would open the County to "rough proportionality" claims.

The County Board of Supervisors ultimately chose not to adopt the implementation program proposed in the memo.

<u>The Challenge to Measure E</u>

Soon after Measure E passed, Alliance petitioned for a writ of mandate as well as declaratory and injunctive relief, seeking to have Measure E declared invalid. Alliance argued, among other things, that Measure E violated the unconstitutional conditions doctrine.

Alliance maintained that conditions imposed by Measure E were exactions, exceeding fair share and lacking a reasonable relationship to the harm flowing from a development. It argued TC-Xa 3 and TC-Xf, as amended, were subject to several interpretations, all of which imposed unconstitutional conditions. A developer would either have to construct every programed traffic-mitigating improvement or merely those necessary to prevent traffic resulting from its own development along with other cumulative developments. Both cases exceeded fair share in that developers must construct road improvements to serve other developments — "[a] project cannot build half of a lane or a small percentage of an interchange or state highway."

As to implementation statement eight, Alliance argued it was inconsistent with policy TC-Xd in that it sought to delegate to Caltrans authority to determine Level of

7

Service conditions, when that responsibility is assigned to the County Department of Transportation.

Taylor (who had moved unopposed to intervene) argued the facial challenge was not ripe for judicial review because the Board of Supervisors had not yet adopted implementation guidelines for Measure E.

On the merits, Taylor disputed that all $400+ million programed traffic improvements had to be completed before any project is approved. Pointing to the County memo, Taylor argued its interpretation of Policy TC-Xa 3 in light of TC-Xf "provide[d] a path for the County decision makers to fulfill their obligation to, wherever possible, construe an initiative measure to ensure its validity." She urged that by reading TC-Xa 3 and TC-Xf together, "discretionary projects that have no cumulative traffic impacts may not be conditioned or denied because necessary road capacity improvements have not been completed."

Further, "[i]f the project's impacts will cause traffic to exceed standards, then the project could construct the needed improvements (possibly with contribution from the County and/or under a reimbursement agreement), or the project could be denied until" others complete the project. She later reiterated, "Measure E does not change the fair share analysis, it simply provides that where a project will result in traffic exceeding [Level of Service] F, the necessary improvements must be built before the project. How that is accomplished is not specified in Measure E and could be accomplished in a variety of ways. An applicant could choose to build the improvements, or wait until other development can/will contribute, or until the County builds the improvement."

As to implementation statement eight, Taylor argued it was included to require the use of Caltrans data on Highway 50, because Caltrans has detectors on Highway 50 capable of collecting real time data, and the County does not: "The County could then use that data to determine level of service, as required under General Plan policy TC-Xd."

The county filed a brief, that while noting, "Measure E undoubtedly could have been drafted clearer," urged the court not to engage in analysis or definitive interpretation of Measure E beyond determining whether Measure E is capable of constitutional interpretation and implementation.

<u>The</u> <u>Trial</u> <u>Court</u> <u>Grants</u> <u>the</u> <u>Petition</u>

The trial court granted the petition in part, striking several amendments to the General Plan including changes to policies TC-Xa 3 and TC-Xf, as well as implementation statement eight. Doing so, the court concluded the petition was not premature, as the challenges "do not rest on speculation as to the meaning of the policies as enacted by initiative or require interpretation by the County in the first instance."

The court found the amendments to Policies TC-Xa 3 and TC-Xf violate the takings clause by conditioning approval on the developer paying more than its fair share for the cost of traffic mitigation arising from the development. The court explained, an "owner/developer seeking approval of a single project is expressly solely responsible to pay for construction of all road improvements necessary to bring the traffic volume on the roads affected by the project to a specified [Level of Service] level. This would require property owners/developers to pay for not only the project's incremental impact to traffic congestion of the County road system, but also be responsible to pay for improvements that arise from the cumulative effect of other projects, and in some instances to pay for projected future increases in traffic. This clearly exceeds the developer's fair share in that it is not roughly proportional to the project's traffic impact it seeks to address."

As to Taylor's proposal to read TC-Xa 3 and TC-Xf together, relieving discretionary projects having no cumulative traffic impacts, the court explained that the amendments do not become constitutional simply because they might be inapplicable where traffic does not increase beyond a certain threshold.

9

It similarly rejected Taylor's assertion that conditioning necessary improvements could be constitutionally construed, "possibly" though County funding contributions or reimbursements — or denying the project until the improvements were completed by others. The court noted that Measure E places improvement construction solely on the developer's shoulders, while at the same time, it fails to mandate that improvement costs exceeding the developer's fair share be reimbursed. The court noted that Measure E, instead, struck the portion of Policy TC-Xg allowing the County to reimburse a project for improvements exceeding the developer's fair share.

Moreover, denying the project until someone else constructs the mandated improvements is still impermissible as it attempts to coerce the property owners to construct the improvements or be forced to wait an indefinite period of time for someone else to construct the improvements.

As to implementation statement eight, the trial court found it in conflict with the General Plan. While Policy TC-Xd requires that analysis periods be based on the County Department of Transportation's professional judgment, statement eight places the determination of traffic levels in Caltrans's hands, "which would presumably include selection of analysis periods, even though policy TC-X[d] mandates that analysis periods shall be based upon the professional judgment of the County Department of Transportation."

DISCUSSION

I

*Ripeness*

On appeal, Taylor first contends the trial court's consideration of the facial challenge to Measure E was premature because it required speculation as to how the provisions would apply to various project applications. She also argues the trial court failed to account for the memo's detailed implementation plan showing Measure E could

10

be interpreted and applied in a constitutional manner. She writes: "the voters approved the policies, but the County was not given an opportunity to even interpret and implement Measure E, despite the fact that County staff had prepared implementing guidelines and had concluded that Measure E could be implemented in an effective and constitutional way in the context of the General Plan." We disagree.

" 'A controversy is "ripe" when it has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made.' " (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 171 (*Pacific Legal Foundation*).) To that end, we first determine if the issues raised are "sufficiently concrete to allow judicial resolution even in the absence of a precise factual context." (*Id.* at p. 170.) If so, we then consider " 'the hardship to the parties of withholding court consideration'. . . ." (*Id.* at p. 171.)

These tests are satisfied here. Nothing precludes resolution of the controversy, as the facial allegation does not depend on the application of the measure to a particular petitioner or future County interpretation. As we explain below, the constitutional challenge to Measure E turns on whether the challenged amendments are reasonably susceptible to a constitutional interpretation. (See *Yee v. City of Escondido, Cal.* (1992) 503 U.S. 519, 534 [118 L.Ed.2d 153] ["As this allegation does not depend on the extent to which petitioners are deprived of the economic use of their particular pieces of property or the extent to which these particular petitioners are compensated, petitioners' facial challenge is ripe"]; see also *Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 218 ["To resolve a facial challenge, we consider 'only the text of the measure itself, not its application to the particular circumstances' of this case"].)

Further, because the challenged amendments are not susceptible to a constitutional interpretation, delaying consideration could only serve to impose unconstitutional conditions or delay on developers and spur unnecessary litigation. (See *Pacific Legal*

11

*Foundation, supra,* 33 Cal.3d at p. 170 ["the requirement should not prevent courts from resolving concrete disputes if the consequence of a deferred decision will be lingering uncertainty in the law, especially when there is widespread public interest in the answer to a particular legal question"].)

We therefore turn to the merits.

## II

### *Policies TC-Xa 3 and TC-Xf*

On the merits, Taylor contends the trial court erred in granting the petition as to amended Polices TC-Xa 3 and TC-Xf. She argues TC-Xa 3 simply governs the timing of infrastructure completion — not who pays or how much. And requiring traffic mitigation before approving new developments is not unconstitutional. She adds that before Measure E, developers could secure approval by contributing to a 10- or 20-year improvement fund: "The unfortunate result was that development projects got built, but the road improvements needed to absorb the traffic did not get built for 10 years, or 20 years, or longer." Measure E effectively directs new development to parts of the County where road infrastructure is already sufficient.

As before the trial court, Taylor argues that nothing in Measure E requires the next developer to build every programed road improvement prior to approval. Rather, discretionary projects need only complete necessary road capacity improvements to prevent traffic from reaching peak-hour gridlock. And discretionary projects not causing such impacts are unaffected. To that end, Taylor argues TC-Xa 3 should be read in light of TC-Xf, such that discretionary projects not causing cumulative traffic impacts would not be conditioned or denied based on unfinished road improvements.

Taylor also echoes her argument before the trial court that nothing in Measure E forces the County to approve a project while imposing conditions to construct improvements benefiting other developers. Rather, a project causing traffic to exceed

12

standards "could construct the needed improvements (possibly with contribution from the County and/or under a reimbursement agreement), or the project could be denied until such time as the road facility project(s) were completed by the County or others." Finally, Taylor maintains that Measure E is simply a land use control, setting forth the circumstances under which a discretionary project may be approved.

Alliance responds that Policies TC-Xa 3 and TC-Xf are incapable of constitutional construction. Whether TC-Xa 3 requires all programed improvements be completed, or merely improvements addressing cumulative traffic impacts, a project must construct improvements going beyond its fair share. As to TC-Xf, Alliance questions the propriety of reading TC-Xf as the more specific and controlling policy, and in any event, by requiring improvement to address cumulative growth, TC-Xf also imposes conditions exceeding fair share.

The County has also filed a brief, arguing, inter alia, that definitive interpretation of Measure E is unnecessary to resolve the facial challenge. The County also argues that Measure E is invalid if it compels or relies on a subsequent County act, and the County has no obligation to adopt a staff implementation program in the abstract.

We agree with Alliance and the County.

We note that the County also argues Measure E is preempted under state law if it unduly burdens the County's ability to provide affordable housing. As we conclude the challenged provisions are unconstitutional, we do not reach this contention.

III

*Standard of Review and Applicable Law*

"An initiative measure ' "must be upheld unless [its] unconstitutionality clearly, positively, and unmistakably appears." ' " (*Pala Band of Mission Indians v. Board of Supervisors* (1997) 54 Cal.App.4th 565, 574.) For a facial challenge to succeed, the plaintiff must demonstrate "the challenged portion will result in legally impermissible

13

outcomes 'in the generality or great majority of cases, the minimum showing we have required for a facial challenge to the constitutionality of a statute.' " (*Larson v. City and County of San Francisco* (2011) 192 Cal.App.4th 1263, 1280 (*Larson*) quoting *San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643, 673.)  Under this test, "we may not invalidate a statute simply because in some future hypothetical situation constitutional problems may arise . . . ." (*California Teachers Assn v. State of California* (1999) 20 Cal.4th 327, 347.)  Conversely, we may not " 'uphold the law simply because in some hypothetical situation it might lead to a permissible result.' " (*Larson,* at p. 1280.)  And to be sure, " '[j]udicial deference to the electoral process does not compel judicial apathy towards patently invalid legislative acts.' " (*Save Lafayette v. City of Lafayette* (2018) 20 Cal.App.5th 657, 665.)

In evaluating whether a statute effects an unconstitutional exaction, under *Nollan–Dolan* and their progeny, we "first determine whether the 'essential nexus' exists between the 'legitimate state interest' and the permit condition . . . ." (*Dolan, supra,* 512 U.S. at p. 386; see also *Nollan v. California Coastal Com* (1987) 483 U.S. 825, 837 [97 L.Ed.2d 677].)  If so, we determine if the degree of exaction demanded by the condition bears the required relationship to the projected impact of the proposed development. (*Dolan,* at p. 388.)  There must be "rough proportionality" between the property the government demands and the social costs of the applicant's proposal.  (*Koontz v. St. Johns River Water Management Dist.* (2013) 570 U.S. 595, 605–606 [186 L.Ed.2d 697] (*Koontz*).)  Put another way, "[u]nder *Nollan* and *Dolan* the government may choose whether and how a permit applicant is required to mitigate the impacts of a proposed development, but it may not leverage its legitimate interest in mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts." (*Koontz*, at p. 606.)

Finally, an unlawful condition need not only be for land — demands for money can also violate *Nollan–Dolan*.  (*Koontz, supra*, 570 U.S. at p. 619.)

14

IV

*Analysis*

Laudable as traffic mitigation is, "there are outer limits to how this may be done." (*Dolan, supra*, 512 U.S. at p. 396.) Here, we agree with the trial court that amended Policies TC-Xa 3 and TC-Xf are unconstitutional. Both interpretations of Policy TC-Xa 3 identified in the County memo ran afoul of *Nollan–Dolan*. If TC-Xa 3 requires the completion of "[a]ll necessary road capacity improvements" to prevent peak-hour gridlock, it plainly casts a wider net than the harm resulting from an individual project. Thus, rough proportionality is unsatisfied and mostly likely essential nexus is as well.

Similarly, if TC-Xa 3 demands only mitigation addressing traffic from the discretionary project combined with "cumulative traffic impacts from new development," a developer must still complete improvements addressing impacts beyond its own. Thus, this too exceeds rough proportionality. (*Dolan, supra*, 512 U.S. at p. 391 [rough proportionality requires the government "make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development"].) Further, there is an inherent difficulty in conditioning approval on the completion of a specific mitigation project — as Alliance notes, one can hardly condition approval on building half an interchange.

Along those lines, Taylor's suggestion that a project "could construct the needed improvements (possibly with contribution from the County and/or under a reimbursement agreement)" is unavailing. For one, as the trial court pointed out, Measure E, removes the portion of Policy TC-Xg authorizing the county to reimburse applicants for road improvements that significantly benefit other developments. The excised language is as follows: "For road improvements that provide significant benefit to other development, the County may allow a project to fund its fair share of improvement costs through traffic

15

impact fees or receive reimbursement from impact fees for construction of improvements beyond the project's fair share."

For another, while presumably nothing precludes the County from reaching a reimbursement agreement, we may not " 'uphold the law simply because in some hypothetical situation it might lead to a permissible result.' " (*Larson, supra*, 192 Cal.App.4th at p. 1280.)

Similarly unavailing is Taylor's suggestion that a developer can simply wait until others complete the improvements. As explained in *Koontz*: "The principles that undergird our decisions in *Nollan* and *Dolan* do not change depending on whether the government approves a permit on the condition that the applicant turn over property or denies a permit because the applicant refuses to do so." (*Koontz, supra*, 570 U.S. at p. 606.)

Reading TC-Xa 3 in light of TC-Xf yields no more success. Incorporating TC-Xf's concurrency requirement would, as the memo explained, affect projects that "worsen" traffic — defined as a 2 percent increase in daily or peak hour traffic, 10 additional peak hour trips, or 100 additional daily trips. If such projects are single family residential subdivisions of five or more parcels, they would be conditioned to construct improvements to maintain Level of Services standards based on existing traffic "plus traffic generated from the development, plus forecasted traffic growth at 10-years from project submittal." All other such projects must construct improvements addressing existing traffic plus traffic generated from the development.

In either case, a developer must construct improvements exceeding the extent of the project's own impact. While the County memo proposed redefining "worsen" to set a higher threshold, exempting more projects from TC-Xf's, that would not cure the disproportionate impact to affected projects. Moreover, an initiative is invalid if its constitutionality depends on a future county act. (See *Citizens for Jobs and the Economy v. County of Orange* (2002) 94 Cal.App.4th 1311, 1333 [initiative may not declare

16

legislative policy and direct that certain events take place to implement that policy]; *City of San Diego v. Dunkl* (2001) 86 Cal.App.4th 384, 399 ["The electorate has the power to initiate legislative acts, but not administrative ones"]; *Pala Band of Mission Indians v. Board of Supervisors, supra,* 54 Cal.App.4th at p. 576 [noting constitutional initiative did "not rely on future legislative action"].)

Finally, we reject Taylor's claim that Measure E is a land use control. Our supreme court explained the difference between a lawful land use control and an unlawful taking in *California Building Industry Assn. v. City of San Jose* (2015) 61 Cal.4th 435, 463. There, a challenge was brought to a city ordinance requiring new residential developments, with 20 or more units, to sell at least 15 percent of units at a price affordable to low or moderate income households. (*Id*. at p. 442.) Finding the ordinance did not violate *Nollan-Dolan*, our supreme court explained that no exaction took place: "the ordinance does not require a developer to give up a property interest for which the government would have been required to pay just compensation under the takings clause outside of the permit process." (*Id*. at p. 461.) Instead, requiring the developer to sell a portion of its units at affordable housing prices, "simply places a restriction on the way the developer may use its property by limiting the price for which the developer may offer some of its units for sale." (*Ibid*.)

Here, by contrast, under Measure E a developer must give up a property interest as a condition of approval: the developer must complete or construct road improvements. The challenged portion of the initiative therefore may not be upheld as a land use control.

The trial court properly struck Measure E's amendments to Policies TC-Xa 3 and TC-Xf.

17

V

*Implementation Statement Eight*

Finally, Taylor contends the trial court erred in granting Alliance's petition as to implementation statement eight, which states: " '[Level of Service] traffic levels on Highway 50 on-off ramps and road segments shall be determined by Caltrans and fully accepted by the County for traffic planning purposes.' " The trial court found the statement in conflict with Policy TC-Xd, which states in part: "Analysis periods shall be based on the professional judgment of the Department of Transportation which shall consider periods including, but not limited to, Weekday Average Daily Traffic (ADT), AM Peak Hour, and PM Peak hour traffic volumes."

On appeal, Taylor argues implementation statement eight can be read together with TC-Xd so as to give meaning to each and allow for internal consistency. She cites purported conflicts between Caltrans and County determinations of traffic levels on segments of Highway 50. "Accordingly," she argues, "Measure E's implementation [statement] eight does not conflict with the County Department of Transportation's authority to exercise 'professional judgment' in analyzing [Level of Service], it simply informs the process by requiring that the data collected by Caltrans be taken into account and used by the County. TC-X[d] discusses the process of analyzing [Level of Service] and notes various sources of data. These two provisions may be read together without conflict." We cannot agree.

As the trial court concluded, implementation statement eight "directly conflicts with and contradicts a policy of the Traffic and Circulation Element of the general plan." Statement eight places the determination of traffic Level of Service squarely with Caltrans. Yet Policy TC-Xd — which Measure E leaves unaltered — requires that traffic be calculated based on Highway Capacity Manual, and as part of that determination

18

requires the County Department of Transportation to use "professional judgment" in selecting the traffic analysis periods.

It is difficult to square that command with implementation statement eight's requirement that Level of Service "be determined by Caltrans and fully accepted by the County for traffic planning purposes." Taylor's suggestions that statement eight simply informs the process, by requiring the County to use and consider Caltrans data, does not in our view harmonize these conflicting directives. Given that the General Plan purports to place power with the County while statement eight places subsuming authority with Caltrans, we agree with the trial court that statement eight is in conflict with the General Plan. We accordingly conclude the trial court properly granted the petition as to statement eight.

DISPOSITION

The judgment is affirmed. Taylor shall pay Alliance's costs on appeal. (Cal. Rules of Court, rule 8.278.)

_____
HULL, Acting P. J.

We concur:

_____
MURRAY, J.

_____
HOCH, J.

19

Filed 5/4/21

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| ALLIANCE FOR RESPONSIBLE PLANNING, | C085712 |
| Plaintiff and Appellant, | (Super. Ct. No. PC20160346) |
| v. | |
| SUE TAYLOR et al., | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendants and Appellants; | |
| COUNTY OF EL DORADO et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of El Dorado County, Warren C. Stracener, Judge. Affirmed.

James L. Brunello for Plaintiff and Appellant.

Law Offices of Donald B. Mooney, Marsha A. Burch and Donald B. Mooney for Defendants and Appellants.

Michael J. Ciccozzi, County Counsel, Breann M. Moebius, Deputy County Counsel, for Defendants and Respondents.

1

THE COURT:

The opinion in the above-entitled matter filed on April 19, 2021, was not certified for publication in the Official Reports.  For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.


BY THE COURT:


_____,
HULL, Acting P. J.


_____,
MURRAY, J.


_____,
HOCH, J.

2