Filed 8/27/14  In re J.F. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re J.F. et al., Persons Coming Under the Juvenile Court Law. | B254541 (Los Angeles County Super. Ct. No. CK68991) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> TIFFANY B., <br><br> Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Anthony Trendacosta, Juvenile Court Referee.  Affirmed.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

_____

The juvenile court adjudged three-year old J.F. and two-year old Jeremiah B. dependents of the court pursuant to Welfare and Institutions Code section 300, subdivision (b) (failure to protect).[1]  Thereafter, the court terminated reunification services as to J.F. and denied reunification services as to Jeremiah.  Tiffany B. (Mother) appeals from the court's orders denying two section 388 petitions she filed seeking to regain custody of the minors or, alternatively, to obtain reunification services so she could reunify with them.  Alfredo C. (father of J.F.) and X.B. (father of Jeremiah) are not parties to this appeal.

We conclude that, because Mother showed, at most, changing but not changed circumstances and failed to show the proposed change of the juvenile court's orders would promote the best interests of the minors, the court did not abuse its discretion in denying Mother's section 388 petitions.  We affirm the orders.

## BACKGROUND

### A.  The sustained petitions

The Department of Children and Family Services (DCFS) filed the operative second amended section 300 petition on behalf of J.F. on June 5, 2012.  As sustained by the juvenile court on August 8, 2012, the petition alleged Mother had a history of substance abuse, was a current user of cocaine, Mother and Alfredo had a history of domestic violence, and Mother and Alfredo recently had engaged in a domestic altercation in which Alfredo assaulted Mother.

On March 21, 2013, a section 300 petition was filed on behalf of Jeremiah, alleging Mother had a history of substance abuse, was a current user of methamphetamine and amphetamine, and had a positive toxicology screen for methamphetamine and amphetamine on March 15, 2013.  An amended petition was sustained on May 10, 2013.[2]

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Although the allegations of the section 300 petition filed on behalf of Jeremiah are described in a report contained in the record, the section 300 petition itself is not contained in the record.

**B. Events leading up to the juvenile court's assertion of jurisdiction**

The events leading up to the juvenile court's assertion of jurisdiction are as follows.

Mother lost her parental rights over her son M.B. in 2010 due to her inability to resolve her substance abuse problems. Mother admitted to DCFS she was "'easily triggered'" to use drugs and had started six programs but completed only one. Mother had a criminal record of convictions for prostitution, possession of cocaine, and domestic violence against Alfredo.

After J.F.'s birth in February 2011, Mother and her new husband Antonio F. agreed to a voluntary family maintenance plan and in April 2011 started receiving family preservation services. Shortly thereafter, Mother and Antonio denied to DCFS allegations that they had engaged in a physical altercation. Mother tested positive for cocaine in July 2011. J.F. was ordered released to Mother's custody and permitted to reside with her at an inpatient substance abuse treatment program.

After Mother completed the inpatient treatment program in December 2011, she moved to a sober living facility. Mother tested positive on a drug test. Consequently, the juvenile court detained J.F. from Mother's care on December 29, 2011.

On March 5, 2012, Mother was terminated from the sober living facility program because she had twice tested positive for cocaine. Mother missed drug tests in March 2012 and April 2012 and later told DCFS she had missed them because she knew she would test positive. On April 4, 2012, Mother told DCFS she had relapsed, used cocaine, was pregnant, and believed Alfredo was the father of her unborn child. She reported Alfredo had "'busted [her] in the face'" when they were "'high'" in March 2012. On another occasion Alfredo had slammed a door on her head during a fight while they were "loaded."

Mother entered an inpatient substance abuse treatment program on April 26, 2012. J.F.'s foster family reported in June 2012 that J.F. was "delighted" to see Mother when she visited him.

3

At the jurisdictional and dispositional hearing as to J.F. on August 8, 2012, the juvenile court sustained the allegations of the second amended petition, removed J.F. from Mother's custody, and ordered Mother to participate in drug counseling, random drug testing, and individual counseling.

In August 2012, Mother was reported to have tested negative for drugs since she entered the inpatient substance abuse treatment program in April 2012.

Jeremiah was born with spina bifida in November 2012 and had to undergo several surgeries. Mother visited him daily while he was hospitalized. Mother agreed to a voluntary family maintenance plan for Jeremiah, was trained in spina bifida care, and moved into an apartment with Jeremiah in January 2013. Mother had visits from J.F. at her home. "[U]nknown" persons visited Mother and smoked an "unknown substance" in her apartment, creating an unhealthful environment for J.F. and Jeremiah. Mother acknowledged she was not fully prepared to care for two small boys and found it "frustrating and exhausting." Mother, who had been advised not to leave Jeremiah in the care of anyone who had not been trained in spina bifida care, left him with his maternal grandmother, who was not trained.

Mother tested positive for methamphetamine and amphetamine in March 2013. Jeremiah was removed from her care and placed in J.F.'s foster home on March 21, 2013. Later, Mother told DCFS that she had lost weight and was going to continue to lose weight because she was going to stay "'high on drugs all the time,'" and she was "'fucking mad that my fucking kids were taken and they're not getting good fucking care. . . .'"

Meanwhile, J.F. was thriving in his placement in foster care. DCFS reported that both J.F. and Jeremiah were bonded to the foster family, who were "a wonderfully [*sic*] and loving family unit," had a son the same age as J.F. who was also bonded to the minors, had an approved home study, and were committed to adopting both J.F. and Jeremiah as a sibling group. J.F. "loves his baby brother and is very attached to him" and attended Mommy and Me classes with his foster mother. Jeremiah's health improved

4

under the foster family's care. He attended physical therapy and was likely to walk in three or four years with ancillary support.

At a jurisdictional and dispositional hearing as to Jeremiah on May 10, 2013, the juvenile court sustained the allegations of the section 300 petition and ordered him to remain detained in foster care. The court continued Jeremiah's matter for disposition, noting Mother was not in full compliance with the case plan and had not made substantive progress. At the same hearing, the court terminated reunification services for J.F., noting Mother was entering her ninth substance abuse program, there was not a reasonable likelihood J.F. would be returned to her care, Mother was not in full compliance with the case plan, and Mother had failed to make substantive progress in court-ordered treatment. The court found by clear and convincing evidence that return of J.F. to Mother would create a substantial risk of detriment to J.F.

At the continued dispositional hearing for Jeremiah on July 24, 2013, the juvenile court denied Mother family reunification services, finding it had terminated reunification services for "a sibling" and Mother had not made a reasonable effort to treat the problems that led to the "removal of the sibling." The court ordered no reunification services for Mother.

## C. Mother's section 388 petitions

After a visit in early April 2013, Mother stopped visiting the minors. In October 2013, Mother, who was six months pregnant, requested visits with J.F. and Jeremiah.

On December 18, 2013, Mother filed a section 388 petition, requesting that the juvenile court take off calendar the section 366.26 hearing for permanent placement for the minors and order the minors placed in the home of Mother or, in the alternative, provide Mother with six months of family reunification services and unmonitored visitation. The petition stated Mother now had the full support of her family and in October 2013 had enrolled in a substance abuse program, started individual counseling, and started psychiatric treatment. The petition asserted that the requested change in the court's order would be in the best interests of the minors because it would give them the

opportunity to bond with Mother and other relatives and ensure visitation with their elder brother, M.B.

On January 27, 2014, Mother filed another section 388 petition, requesting the juvenile court's orders for "[t]ermination of family reunification for siblings as well as termination of parental rights on or about the date of 1/29/14, to be reversed."[3]  The petition stated Mother had been reunited and was living with her biological father "after 17 years," had sibling support, was enrolled in a substance abuse program, counseling, and a mental health treatment program, and had "made progress on setting up visitation with foster parents."  The petition asserted the change in order would be in the best interests of the minors to be joined with "biological siblings."

**D.  The reports and hearing on the section 388 petitions**

On January 29, 2014, DCFS reported Mother was pregnant with her fourth child. M.B.'s adoptive mother had not allowed Mother to communicate with, see, or speak to M.B. except when the adoptive mother brought him to court.  DCFS opined Mother and J.F. would not have an opportunity to bond with M.B. if J.F. were returned to Mother.  In addition, Mother did not have a positive relationship with maternal grandfather, who told her she would not be able to stay with him unless she remained clean and sober.  Mother had not considered maternal grandfather as a possible placement for the minors when they were detained.  DCFS opined that there was no reason to believe Mother would remain sober after her fourth child was born because she had a long history of relapse and three children had been removed from her care after she left treatment programs.  Mother had missed or was late to visits with the minors in December 2013 and January 2014.

---

[3] To the extent Mother's January 27, 2014 section 388 petition requested a modification of the termination of parental rights order of January 29, 2014, it was premature as no such order had been issued at the time her petition was filed.  (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170–171.)  In any event, other than speculating that with continued treatment she might be able to remain in the minors' lives under the beneficial relationship exception to termination of parental rights, Mother does not address the issue of termination of parental rights in her briefs.

At the hearing on the section 388 petitions, Mother's counsel argued it would be in the best interests of the minors to grant the petition because Mother was enrolled in a drug treatment program, drug tested, participated in counseling, and lived with maternal grandfather. DCFS and the minors' counsel argued the modification would not in the best interests of the minors because Mother's circumstances had not changed and she was exhibiting her historic pattern of starting a drug program, then relapsing.

The juvenile court found Mother's circumstances appeared to be changing but had not changed. Although Mother was complying with her programs, it was "not the first time that we've been down this road . . . we're still in the early stages." There was a seven-year history of relapses despite treatment and Mother was only three months into her programs. The court determined that balancing the minors' right to permanency against the facts presented by mother, the minors should not be returned to Mother.

The juvenile court denied Mother's December 18, 2013 section 388 petition. The court denied Mother's January 29, 2014 section 388 petition on the basis that it was "Moot — this is similar to the 388 heard earlier today and denied by the court per reasons set forth on the record 1/29/14." The court terminated Mother's parental rights over J.F. and continued Jeremiah's section 366.26 hearing to March 26, 2014. Mother appealed from the court's denial of her section 388 petitions.

## DISCUSSION

**The juvenile court did not abuse its discretion in denying Mother's section 388 petitions**

### 1. *Section 388 petitions*

Mother contends the juvenile court abused its discretion in denying her section 388 petitions because she was committed to treating her substance abuse problem, had left an abusive relationship, was attentive to the minors, and was a link to the minors' brother, M.B. Alternatively, Mother urges it "was highly possible" that with six months of continued treatment, including psychiatric care, Mother could remain in the minors' lives under the beneficial relationship exception to termination of parental rights. We

7

disagree because Mother failed to show a change of circumstances or that it was in the best interests of the minors to make the requested changes in the juvenile court's order.

Section 388, subdivision (a)(1) states in pertinent part: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. The petition shall . . . set forth in concise language any change of circumstance or new evidence that is alleged to require the change of order or termination of jurisdiction."

"At a hearing on a motion for change of placement, the burden of proof is on the moving party to show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make a change of placement in the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child. [Citation.] A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*Ibid.*) "This determination [is] committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established." (*Id.* at p. 318.)

"'"[I]ssues of fact and credibility are questions for the trier of fact."'" (*In re Precious D.* (2010) 189 Cal.App.4th 1251, 1259.)

### 2. *Mother has failed to show changed circumstances*

We conclude the juvenile court did not abuse its discretion in finding Mother's circumstances were, at best, changing, rather than changed. Mother had a long history of periods of sobriety, especially during her pregnancies, followed by relapse. In particular,

8

Mother failed to reunify with M.B. after he was removed from her care due to her substance abuse. Mother relapsed seven months after J.F. was born, prompting his removal from her care. Four months after Jeremiah was born in November 2012, Mother again relapsed, and Jeremiah was removed from her care. At the time of the section 388 hearing, she was pregnant with her fourth child and was currently in her ninth drug treatment program. As the juvenile court noted, Mother was only in the early months of her latest rehabilitation effort.

Further, although Mother claimed to have left an abusive relationship, she also had a history of returning to abusive relationships.

While Mother claimed she had reestablished a relationship with maternal grandfather for the first time in 17 years and now had family support, this change does not appear to have been of such a "significant nature that it requires a setting aside or modification of the challenged prior order." (*Ansley v. Superior Court* (1986) 185 Cal.App.3d 477, 485.) No details were given about Mother's relationship with maternal grandfather or whether Mother's living situation was permanent. In addition, Mother reported her relationship with maternal grandfather had never been positive, she had not considered him as a possible placement for the minors when they were detained, and maternal grandfather told her she would not be able to stay in his home unless she remained clean and sober. At best, circumstances might have been changing but do not appear to have changed.

The juvenile court did not abuse its discretion in determining Mother had failed to establish changed circumstances.

### 3. *Mother has failed to show a change in the juvenile court's order would be in the best interests of the minors*

Although Mother claims she was attentive to the minors and was a link to the minors' brother, M.B., we conclude the juvenile court did not abuse its discretion in determining Mother failed to establish that a change in its order would be in the best interests of the minors.

9

"[U]p until the time the section 366.26 hearing is set, the parent's interest in reunification is given precedence over the child's need for stability and permanency." (*In re Marilyn H*. (1993) 5 Cal.4th 295, 310.) After termination of reunification services, it is presumed that continued care is in the best interests of the child. (*Id*. at p. 309.)

We conclude the juvenile court did not abuse its discretion in determining it would not be in the best interests of the minors to return them to Mother's custody or give Mother six more months of reunification services in the hope that she would be able to meet the beneficial parental relationship exception to termination of parental rights. At the time of the hearing on the section 388 petition, J.F. had been placed with his foster family for two years, and Jeremiah had been placed with them for one year. The foster family, their biological son, and the minors were closely bonded to each other. The minors were thriving under the care of their foster family, Jeremiah's health had improved, and it was anticipated that Jeremiah would walk with assistance in three to four years. The foster family had an approved home study and was committed to adopting both minors.

Although Mother points to one incident in June 2012 in which the foster family reported J.F. had been delighted to see her, there were subsequent long periods during which she failed to contact the minors. After asking to resume visits with the minors, she was late or missed visits in December 2013 and January 2014. She has failed to show that a strong bond exists between her and the minors or that she has assumed a parental role to them subsequent to their placement in foster care. In addition, DCFS reported that M.B.'s adopted mother was not cooperative in allowing visits between Mother and M.B. Therefore, Mother's argument that she would provide a link between the minors and M.B. is unfounded.

We conclude Mother has not shown how the minors' best interests would be served by depriving them of a permanent, stable home in exchange for an uncertain future. (*In re Stephanie M*., *supra*, 7 Cal.4th at p. 319 [minor's emotional instability, post-traumatic stress, need for stability, limited contact with grandmother, and lack of

10

bond with grandmother supported juvenile court's denial of section 388 petition requesting placement with grandmother].)

We conclude the juvenile court did not abuse its discretion in denying Mother's section 388 petitions.

## DISPOSITION

The juvenile court's orders are affirmed.

NOT TO BE PUBLISHED.


                                             MILLER, J.*

We concur:


ROTHSCHILD, P. J.


JOHNSON, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.