Filed 1/19/22  In re A.R. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| In re A.R. et al., Persons Coming Under the Juvenile Court Law. | C094019 |
| YOLO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>C.E.,<br><br>Defendant and Appellant. | (Super. Ct. Nos. JV2021211 & JV2021212) |

Appellant C.E., mother of minors A.R. and I.M., appeals from the juvenile court's exercise of dependency jurisdiction and removal of the minors from her custody.  She argues the Yolo County Health and Human Services Agency (Agency) failed to comply with the inquiry and notice requirements of the Indian Child Welfare Act (ICWA) because the Agency did not adequately inquire into mother's claim of possible Cherokee

1

heritage. (25 U.S.C. § 1901 et seq.; Welf. & Inst. Code, § 224.2.) She further asserts insufficient evidence supported the juvenile court's jurisdictional and dispositional findings. We conclude there is no merit in her contentions and affirm the juvenile court's orders.

## BACKGROUND

In February 2021, the Agency filed a petition under Welfare and Institutions Code section 300[1] seeking juvenile court jurisdiction over then 15-year-old A.R. and then 9-year-old I.M. The petition alleged mother had a substance abuse problem and untreated mental health issues that impaired her ability to adequately care for the minors. (§ 300, subd. (b)(1).) It also alleged mother and I.M.'s father had a history of domestic violence in the presence of the minors, which placed the minors at risk of physical harm. Finally, the petition alleged, under section 300, subdivision (g), that the whereabouts of A.R.'s father were unknown.

The Agency filed a detention report detailing its investigation. In the report, the Agency explained it had initiated its investigation into mother based on a report alleging general neglect of the minors. Mother had been demonstrating paranoid and other bizarre behavior. Mother's boyfriend, who had been living with mother and the minors, had been recently arrested for possession of large quantities of methamphetamine, heroin, and cocaine, along with a loaded firearm, had posted bail, and then had been arrested again near the home in possession of methamphetamine.

The Agency visited mother, who was unkempt, confused, and had slurred speech. Social workers saw three security cameras on the home and a marijuana grow operation set up in the backyard. Mother had difficulty focusing on conversation with the social workers and rambled about people hacking her cell phones and Internet. She thought the

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

minors were at her brother's home or sister's home but could not recall which. Mother denied using methamphetamine and refused a drug test. When asked about allegations that there were drugs in the home's garage, she stated her boyfriend kept his belongings in the garage and she did not have a key to the garage. She stated she was aware of her boyfriend's arrest, but asserted the arrest was just a "setup."

Social workers discussed a safety agreement with mother, and she agreed to leave the minors with her brother, saying she could use a break from the minors. The social workers then met with the brother, the minors' maternal uncle, who told them the mother's boyfriend was a well-known user of methamphetamine. He suspected the mother was using drugs based on her erratic behavior and explained that she would send the minors to his house alone without any advance notice. On this particular day, the minors had arrived at his house unexpectedly and said mother had asked them to stay at his house.

I.M. reported he did not like mother's boyfriend because the boyfriend would yell and destroy things. Mother and her boyfriend would also fight in the home; they would hit each other, and mother would "slap and punch" the boyfriend. I.M. explained mother had told he and his brother to pack their things and "go explore" because the " 'cops were going to take us away' " in response to a question about why he was currently at the uncle's house. He stated he had seen mother " 'sniff' " drugs up her nose at night, and that she would sometimes be up late at night cleaning the house. I.M. said he did not feel safe around mother's boyfriend but did feel safe with mother.

A.R. said mother's boyfriend had lived with them for two or three years. The boyfriend spent most of his time in the garage and rarely interacted with A.R. A.R. denied seeing drugs in the home or having any knowledge of anyone in the home selling drugs. A.R. noted the boyfriend kept a greenhouse in the backyard that was used to grow marijuana and tomatoes, and that A.R. had worked in the greenhouse removing caterpillars from the tomato and marijuana plants. He denied any fights between mother

3

and her boyfriend. When asked why he was at his uncle's house, A.R. explained mother had told them the government was "hacking them," so he and his brother had to get their things and walk to their uncle's house. A.R. stated he felt safe with his mother and her boyfriend.

Later that day, the social workers returned to mother's home and mother allowed them into the garage. They saw two boxes full of trimmed marijuana and a safe box with honey oil, which mother told them was made by her boyfriend. Several days later, the maternal uncle said he had spoken to mother, who was " 'talking crazy and making no sense.' " She claimed the Agency was a child sex-trafficking ring, and the uncle was concerned about mother attempting to reclaim the minors from his home. The minors were taken into protective custody. The minors' adult sibling also contacted the Agency, saying she did not believe mother was currently capable of taking care of the minors.

When police officers went to mother's home to provide notice of the detention hearing, mother said she was glad the minors would be in protective custody " 'because something is not right with me.' " She asked the officers to look at a satellite dish on her home because there was a camera on it, and she wanted to know who was watching her. Mother said she had no means of communicating with anyone because she had turned off her phone and wireless Internet because someone was watching her.

A social worker spoke with the minors' adult sibling, who said mother first began having mental health issues when the sibling was 11 years old. During previous episodes, the sibling had cared for the minors. She expressed concern about mother's boyfriend and said mother would not be willing to cut him out of her life. She also expressed concern about I.M.'s father, based on previous domestic violence incidents. The Agency reported an extensive history of child welfare referrals regarding mother involving A.R., I.M., and the minors' adult sibling dating back to 2008.

The juvenile court ordered the minors detained. At the detention hearing, mother represented, through counsel, that she had Cherokee ancestry through her grandfather,

4

B.T., who lived in Oregon.[2]  The court ordered the Agency to investigate the issue of Indian ancestry.

In March 2021, the Agency filed a jurisdiction report.  The report explained the Agency had made two separate attempts to reach mother to conduct an ICWA inquiry, but mother had not answered calls and her voicemail box was full.  The report further explained that, shortly after the minors had been taken into protective custody, mother checked into the emergency room and her car was discovered with a bullet hole and inside was the barrel of a gun.  Two days after that, mother's sister reported mother had threatened suicide, and noted mother had a history of jumping off of a bridge and taking pills.  Several days later, the Agency received another report that mother wanted information about how to obtain a restraining order regarding "vague threats" that had been made on Facebook.  The report explained mother was " 'not making sense and kept going on rants about different topic[s].' "

The Agency spoke with the minors' maternal uncle about potential placement and ICWA.  The uncle explained B.T. lived in Silverton, Oregon, and would be appropriate for placement, although B.T. was elderly.  He told a social worker that mother "no longer answers phone calls," and scheduled a later appointment to discuss the family's Native American ancestry.

Later in March 2021, the Agency filed an addendum to the jurisdiction report.  A social worker met with the minors' maternal uncle, who provided "maternal family lineage information" for the ICWA forms.  A social worker was able to speak with mother, who explained B.T. was Cherokee, but was not an enrolled member in the tribe.  Mother had contact information for B.T., and also noted that her great-grandmother, whose name she did not remember, may have been born on native land.  A social worker

---

[2]    Counsel stated it was mother's maternal grandfather, but mother then responded affirmatively when asked if the tribal relationship was through her paternal grandfather.

later spoke to J.W., the minors' maternal grandfather, who stated he was unaware of any Indian heritage.

Mother denied she had any substance abuse problems and denied ever seeing her boyfriend use or sell drugs. She said she was " 'on a break' " with the boyfriend, but that they had " 'been doing phone calls' " and " 'sometimes letters' " while he was in jail. Mother denied any mental health issues, saying she was only depressed because of the coronavirus disease 2019 (COVID-19) pandemic and the juvenile dependency case. Mother discussed problems with her phone, saying it was " 'encrypted' " and "'got wiped,' " and she received a message saying she " 'should report it to the highest government agency as soon as possible.' " She complained the Agency's social workers were " 'unethical' " because they had not shown her a badge. Mother also discussed her history of domestic violence with I.M.'s father. In particular, she thought he used methamphetamine, had locked her in a bedroom, and would yell at her. There was a no-contact order placed on him in 2016.

Mother had met with a clinician at a dual diagnosis substance abuse program. The clinician reported mother had started individual counseling. Mother showed some schizoaffective behaviors because she believed everyone was against her and spoke in incoherent sentences. She had been consistent in attending group classes, but her behavior in class was "erratic." She tested negative for substances on three dates in February and March 2021, but records showed she had tested positive for heroin in 2017.

J.W. and the minors' adult sibling stated mother was suffering from mental health and substance abuse problems. The adult sibling stated mother had said mother would keep her boyfriend out of the home " 'for now, but not forever' " because she did not see why she needed to do what the Agency told her to do. The sibling said she had seen drug paraphernalia in mother's garage and thought mother would continue to use drugs as long as she was with the boyfriend. Mother had used cocaine about two days before the minors had been removed. Mother had a history of associating with drug users, including

6

the boyfriend, the adult sibling's father, I.M.'s father, and A.R.'s father. The sibling also recounted an episode where mother and I.M.'s father had fought, and I.M.'s father used I.M. as a shield. Mother had previously been diagnosed with schizophrenia, posttraumatic stress disorder, and borderline personality disorder, and used to take medication. The adult sibling said mother was talking to mother's boyfriend through the boyfriend's father, and predicted mother would keep the boyfriend, but say he was not her boyfriend.

A social worker spoke with I.M.'s father, who had not seen mother in four years. I.M.'s father stated he was taking domestic violence classes, but did not give the name of the provider or the instructor. He also said he was on probation, but was not able to provide the name of his probation officer or the officer's address.

The Agency mailed ICWA-030 forms (Judicial Council Forms, form ICWA-030 (Jan. 1, 2020)) for both minors to the Bureau of Indian Affairs and three Cherokee tribes on April 8, 2021.

The juvenile court held a contested jurisdiction/disposition hearing on April 22, 2021. The Agency submitted the detention report, jurisdiction report, and addendum into evidence. Mother testified on her own behalf. In relevant part, mother denied she was in a relationship with her boyfriend, stated they had broken up a few months ago, and denied communicating with him in any way. She denied ever seeing the boyfriend use methamphetamine, and when asked if she was aware that he was using methamphetamine, responded, "I'm aware it's not for me to judge a person; however, I don't want him in my life." She denied using methamphetamine or using drugs around her children.

On cross-examination, mother denied any current mental health issues and said she did not need any medication. She explained she had broken up with the boyfriend "the day he went to jail," and said she had only defended him to social workers because she was lied to and manipulated. Mother denied telling the minors' adult sibling that she

7

would keep the boyfriend out of her home "for now, but not forever" and said the sibling was being dishonest. She admitted telling the Agency the government was watching her, but denied actually believing that statement, saying she felt "somebody" was watching her and she was scared.

As to jurisdiction, the juvenile court stated it did not find mother's statements that she was done with her boyfriend to be credible. With respect to the specific allegations in the petition, the court found mother had a substance abuse problem, and that the problem caused risk to the minors because mother had used drugs in front of the minors, suggesting she had "parented while impaired." The court also found mother had mental health issues that had caused her to send the minors to their uncle based on her delusional beliefs, creating a risk to the minors. The court also noted the domestic violence between mother and I.M.'s father, which also established jurisdiction. Finally, the juvenile court determined that A.R.'s father could not be found, but explained jurisdiction based on this fact was contingent on the other jurisdictional findings because it required that mother be unable to provide care or support for the minors.

As to disposition, the juvenile court found mother's boyfriend was not out of her life, the evidence was strong that he both used and sold drugs, and mother had not taken adequate measures to protect the minors from him. Thus, removal was necessary to protect the minors from danger. The court issued findings and orders and checked boxes stating that "[t]he child . . . may be an Indian child," and "[t]here is reason to believe that child may be of Indian ancestry, and notice of the proceedings was provided to the Bureau of Indian Affairs as required by law." The court did not make any other ICWA findings.

8

DISCUSSION

I

*ICWA*

Mother argues the Agency failed to comply with ICWA's requirement that it conduct an inquiry into the minors' Indian ancestry because, among other things, it "failed to interview mother's grandfather, [B.T.], the person through whom she claimed Cherokee ancestry."[3] She asserts we must conditionally reverse and remand the matter for compliance with the Agency's obligations. We disagree.

ICWA imposes certain inquiry and notice requirements if there is a "reason to know" or a "reason to believe" a child is an Indian child. There is a "reason to know" if any of the circumstances under section 224.2, subdivision (d) is met, generally where the court has direct and reliable knowledge the child is an Indian child (§ 224.2, subd. (d)(1)-(6)). A reason to know triggers a court's obligation to confirm whether the child is an Indian child, and the court must treat the child as an Indian child until it determines otherwise. (§ 224.2, subds. (g), (i)(1).) The notice provisions of section 224.3 must also be complied with. (§ 224.3, subd. (a).)

"Reason to believe" exists when there is some indication the child may be an Indian child, but there is no direct knowledge establishing reason to know. (*In re M.W.* (2020) 49 Cal.App.5th 1034, 1044-1045.) A reason to believe triggers the inquiry provisions under section 224.2, subdivision (e), which requires: (1) interviewing parents and extended family; (2) contacting the Bureau of Indian Affairs and the State Department of Social Services to help identify contact information "of the tribes in which

---

[3] Mother also initially contended the notices provided to the Bureau of Indian Affairs and relevant tribes were inadequate, although she later concedes "notice was not technically required" at this stage of the proceedings and states she only asserted the argument to show prejudice.

9

the child may be a member" and "contacting the tribes and any other person that may reasonably be expected to have information regarding the child's membership status or eligibility"; and (3) "[c]ontacting the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." (§ 224.2, subd. (e); *In re D.S.* (2020) 46 Cal.App.5th 1041, 1052-1053.)

Here, the parties agree, and the juvenile court determined, that there was adequate information to establish a reason to believe the minors were Indian children. But the court did not make any other ICWA findings or determine that ICWA applied to the proceedings. Rather, the record indicates the Agency is still in the process of inquiring into the minors' possible Cherokee heritage. Among other things, the Agency interviewed the maternal uncle about information he had on any Indian lineage and contacted the required government agencies for information.

Because the juvenile court has not yet made any specific findings about the applicability of ICWA, however, mother's contention of error is premature. The inquiry into the minors' heritage is incomplete, and any opinion we could give on the inquiry would be advisory. (See *People v. Buza* (2018) 4 Cal.5th 658, 693 ["We . . . abide by . . . a ' "cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more" ' "]; cf. *Safai v. Safai* (2008) 164 Cal.App.4th 233, 242-243 ["The Trustees have advanced no particular reason why this court should rule on those objections in the first instance, when there is nothing to indicate that the trial court will not fulfill its duty at some future time"]; *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 171 [ripeness doctrine generally prevents courts from issuing purely advisory opinions on matters before the controversy between the parties has become sufficiently " 'definite and concrete' "].)

Mother argues the court implicitly determined ICWA did not apply because it "applied the normal standards applicable to the removal and placement of non-Indian

10

children, rather than the heightened standards and preferences of ICWA." The court could have declined to treat the minors as Indian children simply because it did not yet have a "reason to know" they were Indian children, however, rather than because it explicitly found ICWA did not apply. As explained above, the juvenile court would be required to treat the minors as Indian children if there was reason to know they were Indian children. Such treatment continues until the court reviews the Agency's due diligence efforts and copies of notices and the tribes' responses and finds the minor does not meet the definition of an Indian child. (§ 224.2, subd. (i)(1).) The court can find ICWA does not apply if it determines the Agency conducted a "proper and adequate further inquiry" and exercised "due diligence to identify and work" with all the pertinent tribes to verify "whether the child is in fact a member or whether a biological parent is a member and the child is eligible for membership." (§ 224.2, subds. (i)(2), (g).)

As mother acknowledges, at the time of the jurisdiction and disposition hearing, there was no "reason to know" the minors were Indian children. Thus, the court did not make any findings that the Agency conducted a proper and adequate inquiry or exercised due diligence, which it must do under section 224.2, subdivision (i)(2) before it can find ICWA does not apply. We decline to infer that the juvenile court determined ICWA does not apply. Because we cannot infer the juvenile court found ICWA did not apply and the juvenile court did not make an explicit finding, we conclude mother's ICWA contention is not yet ripe. We encourage the juvenile court and the Agency to ensure full compliance with ICWA requirements to the extent they have not already done so.

II

*Jurisdiction*

Mother contends there was insufficient evidence to support the juvenile court's jurisdictional finding under section 300, subdivision (b). She argues the Agency failed to prove her behaviors related to her substance abuse and mental illness created a risk of

11

harm to the minors.  Moreover, the domestic violence allegations were too dated to show evidence of a current risk.  We disagree.

The social services agency must prove by a preponderance of the evidence that the minor comes within the juvenile court's jurisdiction.  (§ 355, subd. (a); *In re Isabella F.* (2014) 226 Cal.App.4th 128, 137 (*Isabella F.*).)  As relevant here, section 300, subdivision (b)(1) authorizes dependency jurisdiction when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent . . . to adequately supervise or protect the child, . . . or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse."  Juvenile dependency proceedings are intended to protect not only children who are currently being abused or neglected, but also "to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm."  (§ 300.2; *In re T.V.* (2013) 217 Cal.App.4th 126, 133.)  " 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' "  (*In re T.V.*, at p. 133.)

"We review the jurisdictional findings for substantial evidence.  [Citation.]  We consider the entire record, drawing all reasonable inferences in support of the juvenile court's findings and affirming the order even if other evidence supports a different finding.  [Citation.]  We do not consider the credibility of witnesses or reweigh the evidence.  [Citation.]  Substantial evidence does not mean 'any evidence,' however, and we ultimately consider whether a reasonable trier of fact would make the challenged ruling in light of the entire record."  (*Isabella F., supra*, 226 Cal.App.4th at pp. 137-138.)

Here, the juvenile court carefully considered how mother's various conditions affected the minors and their physical and mental well-being.  As to mother's mental illness, the court reviewed evidence that, while mother had previously been diagnosed and medicated for multiple mental illnesses, she was no longer taking medication and did

12

not believe she needed any treatment. As a result, she suffered from delusions that she was being watched by the government or others, which led her to send the minors out of the house with little notice and without arranging for their care. She had done this more than once and then did not know where she had sent the minors. The record also provided sufficient evidence of mother's erratic behavior to conclude it placed the minors at risk of harm, including her frequent statements to social workers and others that she was being hacked or observed, her statements that the Agency was a child sex-trafficking operation, and her threats of suicide. This evidence was sufficient to conclude mother's mental illness posed a substantial risk of *some* serious physical harm or illness to the minors. (*In re Travis C.* (2017) 13 Cal.App.5th 1219, 1226-1227 [recognizing it is not necessary for the social services agency or the juvenile court to precisely predict what harm will come to children because a parent fails to consistently treat his or her mental illness].)

Likewise, mother's substance abuse posed a risk to minors because of its contribution to her erratic behavior and her inability to protect the minors from exposure to her boyfriend. Although mother had several negative drug tests over the life of the case, she initially refused to be drug tested and did not test for some time after the minors were initially removed. There was drug use in the home in front of the minors, the minors were aware there were drugs in the garage, and at least one of the minors had access to marijuana because he had been asked to work in the greenhouse in the backyard. The minors' adult sibling also stated mother had used cocaine shortly before the minors' removal and mother's erratic behavior during her initial contact with Agency social workers suggested she was under the influence. The boyfriend had been arrested with large quantities of drugs and other indicia of drug sales and was later arrested with drugs near the home. Similarly, the allegation of domestic violence, while somewhat dated, mirrored similar domestic violence that was occurring in front of the minors

between mother and her boyfriend. The evidence was sufficient to establish a basis for the juvenile court's jurisdiction.

III

*Disposition*

Mother contends insufficient evidence supported the juvenile court's disposition order removing the minors from her custody. Highlighting her testimony at the disposition hearing, she argues the court's concern that she would continue her relationship with her boyfriend was "pure speculation unsupported by the record" and there was no evidence he presented any physical danger to the minors. Thus, she claims there was not "clear and convincing evidence the children would be in danger if returned" to her care. We disagree.

Before removing a minor from his or her parent's custody, the court must find, by clear and convincing evidence, that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1); *In re T.W.* (2013) 214 Cal.App.4th 1154, 1163.)

"A removal order is proper if it is based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent." (*In re T.W., supra*, 214 Cal.App.4th at p. 1163.) It is not required that the parent be dangerous or that the child have been harmed before removal is appropriate. (*Ibid.*) "The focus of the statute is on averting harm to the child." (*Ibid.*) " 'We review a dispositional order removing a child from parental custody for substantial evidence.' " (*In re A.F.* (2016) 3 Cal.App.5th 283, 292.)

Here, the juvenile court expressly considered mother's testimony and found it not credible, based in part on her shifting claims about her relationship with her boyfriend

14

and her statements to the minors' adult sibling that implied she was only breaking up with the boyfriend for appearances. We decline to second-guess the court's credibility determination.

Nor do we agree the court's disposition orders were based on pure speculation. As explained above, mother's substance abuse and mental illness problems caused her to send the minors away from the house with little notice and without arranging for their care. She implied to the minors' adult sibling that she would be allowing her boyfriend back into the home, exposing the minors to what mother acknowledges is an "admitted methamphetamine addict and likely drug dealer." Mother and her boyfriend engaged in physical fights in front of the minors, exposing them to domestic violence, and one of the minors stated he did not feel safe around the boyfriend. (*In re T.V., supra*, 217 Cal.App.4th at p. 136 [exposure to "pattern of domestic violence" creates "substantial risk of harm if returned home"].) Moreover, mother did not acknowledge her mental health issues or even her general mental instability, and did not think she needed medication, even though evidence suggested her delusions affected her parenting. There was thus ample evidence to find substantial danger to the minors if they were returned home.

Mother argues the juvenile court should have considered less restrictive alternatives to removal, such as return of the minors to mother with "additional follow-up upon the boyfriend's release to ensure mother did not allow him back into" the home. Given the court's credibility finding as to mother's statements regarding her relationship with her boyfriend and her statement that she was only breaking up with her boyfriend, "for now," it is unlikely mother would cooperate with such an arrangement.

The record supports a finding that mother was unable to provide proper care for the minors, that they would be at risk of harm if they remained in her custody, and that no alternatives to removal existed. (§ 361, subd. (c)(1).) The juvenile court's disposition order removing the minors from mother's custody was proper.

# DISPOSITION

The juvenile court's orders are affirmed.

/s/
HOCH, J.

We concur:

/s/
MAURO, Acting P. J.

/s/
MURRAY, J.