Filed 8/1/25  In re A.V. CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

|  |  |
|---|---|
| In re A.V., a Person Coming Under the Juvenile Court Law. | |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> A.C., <br><br> Defendant and Appellant. | C101975 <br><br> (Super. Ct. No. STK-JD-DP-2024-0000209) |

Appellant A.C., mother of minors S.V., A.V., and D.V., appeals the juvenile court's order removing the minors from her custody, claiming sufficient evidence did not show there was a substantial danger of harm if the minors remained in her care or that no reasonable means short of removal existed to protect them.  She also contends respondent San Joaquin County Human Services Agency (Agency) and the juvenile court failed to

1

comply with the inquiry requirements of the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and related California law, requiring remand. The Agency argues sufficient evidence supports the removal order and the ICWA claim is premature.

We conclude sufficient evidence supports the juvenile court's dispositional orders removing the minors from mother's custody and that mother's ICWA challenge is not ripe for review. We shall affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Mother and G.V. (father) began dating in 2015. Their tumultuous relationship has been plagued by father's significant substance abuse issues and domestic violence in the presence of their three young children.

On June 4, 2024, mother called law enforcement to report a domestic violence incident that had occurred two days earlier during which father pushed and hit mother while she was holding infant D.V. (the June 2024 incident). During the incident, father hit D.V. on the side of his face, resulting in bruising; he also shattered a mirror near where D.V. was lying on a bed. Father was highly intoxicated at the time.

An emergency protective order was granted, and mother later obtained a temporary restraining order on June 11, 2024, prohibiting father from contacting, harassing, or abusing mother and the children. To avoid having the Agency elevate the case to juvenile court, the parents agreed to a safety plan that required them to abide by the restraining order and to participate in voluntary services with Family First Prevention Services.

Ten days after obtaining the restraining order, however, mother sought to have it removed, stating she did not feel threatened by father since he allegedly was seeking treatment and therapy. When the social worker learned of mother's request to terminate the restraining order, the social worker informed mother that even if it were revoked, mother could not allow father to be around her and the children; mother said she understood and agreed. Nevertheless, mother allowed father to visit with the minors on

2

June 23, 2024, which the social worker only discovered when she called father and mother answered his phone. Mother said father came to visit the minors because he had not seen them; they discussed moving forward and possibly getting back together in the future.

Mother's request to terminate the restraining order was granted on June 24, 2024, prompting the Agency to obtain a protective custody order and remove the minors from the home the following day as mother had shown no ability to protect them from further domestic violence.

A few days after the minors were removed under the protective custody order, mother told a social worker that she understood the Agency's concern about her current relationship with father given their prior referral history and the domestic violence and substance abuse issues in the home. She was unable to answer when asked what would have happened to the minors if the Agency had not intervened, although she did state that not having father around would alleviate the problems. And she said that she did not know how a child's exposure to domestic violence could adversely affect them. Father indicated he was somewhat concerned about how his drug use affected his ability to parent, but not concerned about how the domestic violence affected his children.[1] Father also stated he had "no knowledge" of the effects of domestic violence exposure on a child.

Given the parents' disregard for the safety plan and violation of the restraining order, the Agency promoted the matter to the juvenile court rather than allow mother and father to participate in voluntary prevention services as originally contemplated. The Agency filed a dependency petition on the minors' behalf, alleging failure to protect

---

[1] When asked to rate his concerns from one to 10 (10 being the highest level of concern), father stated he was concerned about a "5" regarding how his drug use affected his ability to parent and "0" for how the domestic violence affected his children.

3

(Welf. & Inst. Code, § 300, subd. (b)(1)),[2] serious emotional damage (*id.*, subd. (c)), and abuse of sibling (*id.*, subd. (j)).  At the time, S.V. was eight, A.V. was six, and D.V. was three months old.

According to the petition, the parents had a history of engaging in domestic violence in the minors' presence; mother failed to protect the minors from this domestic violence; and father's extensive history of violently assaulting mother and his substance abuse, including use of alcohol and methamphetamine, severely impaired his ability to safely parent the minors.  It was alleged that father had hit mother on several occasions in the presence of the minors, aggressively grabbing her by her neck and digging his fingers into her surgical wounds where she had had her thyroid removed because of cancer.  The petition further alleged that on multiple occasions mother exposed the minors to domestic violence, obtained restraining orders against father, but then sought to terminate the restraining orders notwithstanding father's continued violent behavior and substance use.  For example, similar to the June 2024 incident where D.V. was injured, in August 2018 father had hit A.V., who was then seven months old while he was physically attacking mother as she held A.V. (the August 2018 incident).[3]  Although mother had obtained a restraining order against father after the August 2018 incident, she had it terminated a year later in 2019.

Father was charged with child abuse and domestic violence based on the August 2018 incident and pled guilty to misdemeanor domestic violence.  Mother later admitted that while this was the first reported incident of domestic violence, there had been others

---

[2]  Further undesignated statutory references are to the Welfare and Institutions Code.

[3]  During the August 2018 incident, mother had allowed father to visit with S.V. and A.V. outside but would not allow father to come inside the home.  When the visit ended, father tried to follow mother inside, she attempted to stop him, and he pushed past her, hitting A.V. on the head and arm while mother held her.

that S.V. and A.V. had witnessed. Mother also disclosed that S.V. was showing signs of aggressive behavior, which mother believed resulted from witnessing the domestic violence.

During another incident in February 2024, S.V. reported that she saw father hit mother, who was then pregnant with D.V., and asked someone at her school to call the police to check on mother because father was often angry and hit mother. A.V. confirmed the parents argued all the time and that she had seen father hit mother in the stomach. S.V., however, later claimed the parents only argued about once a year.

At the initial detention hearing, the Agency recommended the minors be detained in out-of-home care based on the family's prior child welfare history; prior incidents of domestic violence between mother, father, and mother's family members; father's extensive drug and alcohol use; and his unsuccessful attempts at treatment. The juvenile court found prima facie evidence that the minors were described by section 300 and detained the minors from the parents. The court placed them with maternal aunt (aunt) and ordered visitation.

The Agency's jurisdiction/disposition report recommended the juvenile court find the petition allegations true and order reunification services for the parents. The report cited mother's multiple requests to vacate restraining orders as evidence demonstrating her disregard for the minors' safety and a failure to protect them from father's domestic violence. Father's alcohol and substance use and his physical assaults on mother, according to the Agency, demonstrated a complete lack of regard for the minors' safety and well-being. The report noted father's criminal history included eight misdemeanor convictions for violating a domestic violence court order (Pen. Code, § 273.6), and one misdemeanor conviction for battery on a spouse, child's parent, or a dating partner (*id.,* § 243, subd. (e)(1)).

5

The matter was set for a contested combined jurisdiction and disposition hearing in August 2024. In July 2024, father's counsel informed the juvenile court that father apparently was doing well in a treatment program. The court gave the Agency discretion to increase and allow unsupervised visits with the minors.

The contested jurisdiction/disposition hearing took place over two days in August and September 2024. Investigating social worker, Cecilia Rodriguez, testified that mother had reported father was "blackout drunk" during the June 2024 incident when he hit mother and D.V.; mother said she had left the minors in father's care while she ran errands, and when she returned home, father accused her of cheating on him. During the confrontation, father broke a mirror close to where D.V. was lying on a bed, he hit mother while she was holding D.V., and he also hit D.V. on the side of the head during the scuffle, causing bruising.

The delivered service log Rodriguez prepared stated that mother said she placed D.V. back on the bed after father hit him, leaving him alone with father, as she ran out of house; mother then told eight-year-old S.V., who was playing outside with six-year-old A.V., to run inside and grab D.V. because mother knew father would not hurt S.V. S.V. retrieved D.V. and mother and the minors left. Mother also told Rodriguez that father was similarly intoxicated on each of the two weekends preceding the June 2024 incident and often drank to excess. Based on her training and experience and given father's appearance and demeanor when she interviewed him, Rodriguez believed father was using methamphetamine again.

Rodriguez was concerned that even though father often drank and became violent, mother continued to allow father to reside in the home with the minors. And although mother and father had agreed to the safety plan prohibiting father from being around the minors, they each violated the safety plan (and the restraining order) when mother allowed father to visit the minors. Mother also did not inform Rodriguez that she was filing to terminate the restraining order before she did it. Rodriguez was also concerned

about three domestic violence incidents that father had disclosed where he claimed mother, or her family members, had been the aggressors; he showed her photos of scratches or injuries to his face he said he received during these incidents. According to Rodriguez, the day she called father to inquire about drug treatment and mother answered his phone (while the restraining order was still in effect), she could hear what sounded like people (later identified as mother's brother and father) attacking father and yelling at him not to be around mother.

Although S.V. and A.V. reported feeling safe at home, Rodriguez assessed the risk to the minors as "high." In so concluding, she cited their young ages, that at least two domestic violence incidents had been documented within the last year, the overall family history and pattern of domestic violence, and father's criminal and substance abuse history.

Case-carrying social worker Ana Diaz testified that during family background interviews mother reported having a strong relationship with her parents and siblings, that she had been employed for several years at two different stores, and that she did not abuse any substances. Father reported struggling with substance abuse for at least eight or nine years.

According to Diaz, mother and father were not living together at the time of the August 2018 domestic violence incident, and while mother had obtained a temporary restraining order, she asked for it to be terminated a year later because father was six months clean, about to graduate from drug court, and was employed. Mother had sought to terminate the June 2024 restraining order after only 10 days because father was supposedly enrolling in a treatment program and therapy and she no longer felt threatened by him. In July 2024 following the detention hearing, mother had filed for a new restraining order against father in family court, but the request was denied.

Diaz acknowledged that between 2019 and 2023 the Agency had not filed a petition to remove the minors from mother's care and there were no reported incidents of domestic violence during that time. She also acknowledged mother and father were not currently living together because father was in a treatment program. When Diaz interviewed A.V. and S.V. in August 2024, A.V. reported hearing her parents argue and said it was not safe to be around father. S.V. reported being sad and said she had heard her parents yelling; she was also having difficulty in school due to absences. Diaz also acknowledged that during visits mother was loving and attentive to the minors and that she had been actively engaged in her parenting classes and counseling sessions. Father appeared sober and acted appropriately during his visits.

Diaz opined that it was not presently safe to return the minors to mother's care because there was a long pattern of domestic violence and substance abuse from the beginning of the parents' tumultuous nine-year relationship that had not been adequately addressed or resolved. She believed the parents had little insight into how the domestic violence negatively affected the minors. But Diaz conceded some of the reports and counseling notes indicated that mother regretted dropping the restraining order, that she recognized father had codependent tendencies, and that she acknowledged the harmful impact of domestic violence on the minors. Diaz also testified that while she wanted mother to complete victim domestic violence services before the minors were returned to her care, she did not make the referral until August 2024, approximately seven weeks after the detention hearing as she was unaware those services were available to mother. Once she knew mother could access these services, she immediately made the referral. Regardless of the delayed referral, Diaz noted mother's initial individual counseling referral addressed domestic violence issues.

The aunt testified that mother's nearly decade-long relationship with father had been fraught with domestic violence from the beginning. But aunt did not recall telling Rodriguez that a few weeks before the June 2024 domestic violence incident, father

8

pressed his fingers into mother's cancer surgical scars on her throat. She denied witnessing domestic violence during mother's pregnancy with D.V., but said mother had told her that she and father were arguing again, and aunt also admitted that she had heard something about father striking mother while mother was pregnant with D.V. She also admitted that she and other family members confronted father at the parents' apartment while the minors were inside, although she denied anyone accosted father. She knew father had substance abuse issues with methamphetamine, alcohol, and marijuana and said the minors were present when he was under the influence. In June, mother asked her aaunt for help moving father out of the home and removing his name from household bills. Father had told the aunt that he was entering a substance abuse treatment program, and mother indicated she wanted him to take the program seriously to get clean. Aunt believed mother was attentive to the minors' needs, that she took good care of them, and that they were very bonded to mother.

Maternal grandfather testified regarding dispositional issues. Prior to the minors' removal, he saw them about once a week, and they were clean, well-fed, appropriately dressed, and very loving towards mother; they missed her greatly. He claimed he only learned about the parents' domestic violence issues when the Agency removed the minors. According to the grandfather, father was absent a lot, lacked gainful employment, and had significant substance abuse issues that made him get "violent and crazy."

Based on the dependency reports and testimonial evidence, the Agency argued the juvenile court should find the petition allegations true and offer services to the parents, but continue the minors in out of home placement because it was unsafe to return the minors to mother as the parents still lacked meaningful insight into the potential physical and emotional harm to the minors from their domestic violence. Minors' counsel agreed the court should find jurisdiction, provide reunification services to the parents, and not place the minors with either mother or father until they demonstrated further progress

with services.  Father objected to all recommendations and submitted without further argument.

Mother's counsel argued the juvenile court should not find the petition allegations true as to her because current circumstances did not show a risk of harm to the minors and there was a lack of evidence showing the minors had suffered or would suffer serious emotional damage.  According to counsel, mother was a victim of domestic violence herself, had not failed to protect the minors, and there was no risk of harm if the court placed the minors in her care; counsel also emphasized the minors loved and missed her and that they were being harmed by being away from mother.  Counsel argued the Agency had failed to make reasonable efforts to prevent removal because the Agency had not given mother the opportunity to participate in the Family First Prevention Services program on a voluntary basis as originally contemplated under the safety plan and had failed to timely refer mother to domestic violence resources.  In mother's view, clear and convincing evidence did not support removal because nothing showed the minors' physical custody could not be returned to her.

Following the contested hearing, the juvenile court found the petition allegations true, adjudged the minors dependents under section 300, and detained them from the parents.  The court found there was a substantial danger if the minors remained in the parents' care, that reasonable efforts had been made to prevent or eliminate the need for removal, and that no reasonable alternatives to removal existed.  The court adopted the remaining recommended findings and orders in the jurisdiction/disposition report, but made no ICWA findings.  Mother timely appealed.

## DISCUSSION

### I

### *Removal Order*

Mother does not challenge the jurisdictional findings, but challenges the juvenile court's dispositional order removing the minors from her care, arguing that:

10

(1) substantial evidence does not support the juvenile court's findings that the minors would be endangered in her care or that no reasonable means short of removal existed to protect them; and (2) the court failed to inquire about reasonable efforts made to avoid removal or consider alternatives to removal from mother's custody and failed to state facts on which its removal order was based.  We disagree.

Juvenile dependency proceedings are intended to protect not only children who are currently being abused or neglected, but also "to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm."  (§ 300.2; see *In re T.V.* (2013) 217 Cal.App.4th 126, 133.)  " 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' "  (*T.V.*, at p. 133.)

To support an order removing a child from parental custody, the juvenile court must find clear and convincing evidence that (1) there is or would be "a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor returned home," and (2) "there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."  (§ 361, subd. (c)(1).)  The court also must "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor" and "state the facts on which the decision to remove the minor is based."  (*Id.*, subd. (e).)

"In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention."  (*In re D.B.* (2018) 26 Cal.App.5th 320, 332; accord *In re I.R.* (2021) 61 Cal.App.5th 510, 520.)  "A removal order is proper if it is based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent."  (*In re T.W.* (2013) 214 Cal.App.4th 1154,

11

1163.)  The parent need not be dangerous, and the minor need not have been harmed before removal is appropriate as the focus of the statute is on *averting* harm to the child. (*In re D.D.* (2019) 32 Cal.App.5th 985, 996.)

"The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order." (*In re Javier G.* (2006) 137 Cal.App.4th 453, 462 [applying § 361, subd. (c) within the context of a § 387 removal].)  When reviewing removal findings, " '[w]e review the record in the light most favorable to the trial court's order to determine whether there is substantial evidence from which a reasonable trier of fact could make the necessary findings based on the clear and convincing evidence standard." (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1239, italics omitted, disapproved on other grounds in *Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 631, fn. 8.)  In other words, we must evaluate whether there is substantial evidence from which a reasonable trier of fact could have found the need to remove the minors was highly probable.  (See *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995.)

In this case, mother first asserts it was mere speculation that the alleged harmful conduct--her failure to protect the minors from father's domestic violence and substance abuse--would recur, and that such speculation was insufficient to support finding a substantial risk of danger at the time of the dispositional hearing.  Viewing the evidence in a light most favorable to her, mother asserts the evidence of substantial danger was insufficient because:  she had shown an ability to separate from father in August 2018 even when there was no Agency involvement; she had reported the June 2024 incident to law enforcement shortly after it happened and had obtained an emergency protective order; her relatives assisted her in separating from father and moving him out of the family home; the maternal relatives were vigilant about mother's and the minors' safety; she had agreed to participate in voluntary services and had participated in individual counseling and parenting classes; and father had entered a residential treatment program.

But a reasonable trier of fact could interpret the evidence differently than mother urges. (See *T.J. v. Superior Court, supra*, 21 Cal.App.5th at pp. 1239-1240 [we view the evidence in the light most favorable to the court's order].)

While a finding of domestic violence may not "alone provide the clear and convincing evidence necessary to justify removing a child" (*In re I.R., supra,* 61 Cal.App.5th at p. 520), the juvenile court here relied on more than the general existence of domestic violence. As the court noted, in their nearly decade-long, tumultuous relationship, father repeatedly attacked mother, often while she was holding their young, defenseless children, which directly put the children in harm's way. In 2018, father had hit A.V. while attacking mother, and he did the same to D.V. in 2024; each child was only a few months old at the time. Yet mother continued to reside with father or allow him to interact with her around the minors. As counsel noted, she also left the minors alone with father despite knowing he was abusing alcohol or drugs to the point where he was often "blackout drunk." Mother also put her minors in dangerously compromising positions--such as leaving a three-month-old baby alone with father after he had hit her and the baby and then telling the eight-year-old minor to go get the baby while father was still intoxicated and dangerous. The court reasonably could have determined mother's actions demonstrated a lack of protective capacity for the minors.

Although mother did obtain restraining orders against father in both August 2018 and June 2024, each time she asked the court to vacate those orders before they expired. Here, mother sought to remove the restraining order *only 10 days* after it was issued and even *before* father began participating in a treatment program. Mother violated the restraining order by allowing father to visit the minors and violated the safety plan she had agreed to with the Agency in an attempt to avoid going to court. As both counsel for the Agency and counsel for the minors noted, this evidence shows mother could not be trusted to follow court orders or Agency safety plans put in place to ensure the minors' safety while in her care. Further, father had at least eight convictions for violating

13

domestic violence restraining orders, demonstrating a clear disregard for court orders to stay away from protected family members.

To the extent mother claims she had demonstrated an ability to separate herself from father after the August 2018 incident, she clearly did not remain separated from him. Rather, evidence showed she had subjected herself and the minors to father's drug and alcohol abuse and violent outbursts for at least eight or nine years. After the most recent incident of violence, mother even reported that she and father had discussed the possibility of moving forward and getting back together in the future. As the minors' counsel argued, mother's claim that she could, and would, separate herself from father was not credible.

And while it is true that mother's family appeared supportive, evidence in the record showed they, too, physically fought with father while the minors were present thus subjecting the minors to further domestic violence.

Based on the totality of this evidence, the juvenile court reasonably could conclude that mother's past conduct of repeatedly exposing the minors to domestic violence and dangerous situations with father, her disregard for safety plans and restraining orders meant to protect her and the minors from father, her multiple requests to vacate the protective restraining orders before they expired (and, in the June 2024 case, before father had actually entered treatment), and the likelihood that mother was once again considering father as a partner, showed the conditions that necessitated declaring the minors dependents were likely to recur. As mother herself concedes, a parent's past conduct is a good predictor of future behavior, and the court properly considered her past conduct in determining the minors were at a substantial risk of danger if left in her care. (*In re Petra B.* (1989) 216 Cal.App.3d 1163, 1169-1170.)

This evidence supports a conclusion that the minors could not safely be returned to mother's custody at the time of the dispositional hearing even if father was out of the home and in treatment. Whether other evidence in the record can support the opposite

14

inference does not change our analysis as the reviewing court determines only if there is " 'substantial evidence, contradicted or uncontradicted' " to support the juvenile court's findings. (*In re I.J.* (2013) 56 Cal.4th 766, 773; see *In re M.R.* (2017) 8 Cal.App.5th 101, 108 ["we do not consider whether . . . the juvenile court could have drawn a different conclusion but whether there is substantial evidence to support the conclusion that the court did draw"].) Mother's interpretation of the evidence fails under the applicable standard of review; it is the trial court's province to decide issues of credibility, and the juvenile court decided the credibility issue against her. (*I.J.*, at p. 773.)

We reject mother's reliance on *In re Ma. V.* (2021) 64 Cal.App.5th 11 to argue the juvenile court's removal order essentially punished her for being a victim of domestic violence. While the court in *Ma. V.* did observe a "perceive[d]" trend of mothers being punished as victims of domestic violence in certain types of dependency cases (*id.* at pp. 25-26), the cases to which the court referred were ones, where, like there, the mother had managed to distance herself from her abuser for a significant period with no abuse. (*Ibid.*) The evidence in *Ma. V.* showed the abuser had left the family home, the mother had ended her relationship with him; she had not had any contact with him in 10 months, and had not engaged in any new romantic relationship where domestic violence was an issue. (*Id.* at p. 23.) Under those circumstances, the appellate court found the juvenile court erred in focusing on mother's past as a victim of domestic violence because it was not a current risk at the time of the hearing. (*Ibid.*)

Here, by contrast, as we have described *ante*, the juvenile court did not unnecessarily focus on mother's domestic violence past without considering other relevant harm factors at the time of the hearing. Mother's recent actions amply supported finding a current threat to the minors' health and well-being.

Mother next argues the juvenile court did not find the Agency made reasonable efforts to prevent the need for removing the minors from the home, or state facts on which it based its removal order. We disagree.

15

Following the close of evidence, counsel for the Agency, the minors, and mother all vigorously argued over whether the minors could safely be returned to mother's care, whether father's removal from the home while in treatment was sufficient to alleviate the risk of substantial danger to the minors, and whether the Agency had made reasonable efforts to prevent removal. Mother's counsel expressly asked the court to find that reasonable efforts had *not* been made to prevent removal because the Agency promoted the case to juvenile court rather than refer mother to the voluntary services as originally contemplated and because it took several weeks to refer her for victim domestic violence services. The Agency countered that the voluntary services program was not a viable option because mother intentionally violated the safety plan by allowing father to be around the minors; given the very young ages of the minors and the traumatic effects of the continuous domestic violence in the home, the risk of harm was deemed too high to allow them to remain with the parents while they participated in a voluntary case plan. The Agency also pointed out that mother had been referred to services and counseling that addressed domestic violence, but needed to progress further in her services before the minors could safely be returned to her care.

After considering the parties' arguments, the juvenile court expressly adopted the Agency's recommended findings regarding the existence of a substantial danger of harm, the need to remove the minors, the reasonableness of the efforts made to avoid removal, and the lack of reasonable alternatives to removal. Substantial evidence supports the court's findings. As the court explained on the record during the hearing, the Agency had reasonably attempted to engage in a safety plan with the parents rather than remove the minors initially, but that that alternative was not viable after the parents violated the safety plan and mother terminated the restraining order. Also, because mother and father had been engaged in services for only a few short months but had struggled with substance abuse and domestic violence issues for nearly a decade, the court believed

16

further progress was needed to combat the substance abuse and domestic violence issues harming the minors.

Mother's admitted violation of the safety plan, her failure to abide by the restraining order, her voluntary request to remove the restraining order even before father went into treatment, and her demonstrated lack of insight into the detrimental effects of domestic violence and substance abuse on the minors shows the juvenile court reasonably could conclude by clear and convincing evidence that the Agency had attempted to avoid removal but that no reasonable alternatives to removal existed under the circumstances.

II

*ICWA*

Mother also urges us to conditionally reverse the dispositional order because the Agency and the juvenile court failed to comply with the ICWA's inquiry and notice requirements. We conclude her challenge is not ripe.

A. *Additional Background*

At the initial detention hearing, both parents denied Indian ancestry. They later submitted ICWA-020 Parental Notification of Indian Status forms confirming they had no Indian ancestry.

The jurisdiction/disposition report stated there was no reason to believe the minors were Indian children under the ICWA because mother, father, maternal grandmother, maternal aunt, and two maternal uncles had each signed ICWA-020 forms indicating that none had Indian ancestry. Paternal grandmother also executed an ICWA-020 form denying Indian ancestry. Contrary to the report, however, an ICWA-020 form filed for maternal grandmother stated that she is or may be a member or eligible for membership in the Cherokee tribe and that one or more of her parents, grandparents, or other lineal ancestors (whom she did not specifically identify) is or was a member of a federally recognized tribe.

17

Neither the juvenile court nor any of the parties addressed the applicability of the ICWA during the contested jurisdiction/disposition hearing. And the court made no ICWA findings at the conclusion of the hearing.

In August 2024, the Agency filed a Notice of Child Custody Proceeding for Indian Child (ICWA-030) form notifying the parents, three Cherokee tribes,[4] and the Sacramento Area Director of the Bureau of Indian Affairs (BIA) of an ICWA hearing set in November 2024. The form indicated that the minors may have Indian heritage through their maternal side, and included known names, dates and places of birth or death, current or former addresses, and potential tribal affiliations for mother, father, maternal and paternal grandparents, maternal great-grandmother, and maternal great-grandfather. The Agency also included information on maternal great-great-grandmother (who was listed as having Cherokee heritage), maternal great-great-great-grandfather and great-great-great-grandmother. The record does not contain any responses from the notified tribes or indicate whether the ICWA hearing occurred as scheduled.

B. *Applicable Law*

"The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for removal of Indian children from their families, and by permitting tribal participation in dependency proceedings.' " (*In re A.W.* (2019) 38 Cal.App.5th 655, 662.) Under corresponding California law, the juvenile court and the child welfare agency have "an affirmative and continuing duty to inquire" whether a child in a dependency proceeding may be an Indian child. (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125; § 224.2, subd. (a); Cal. Rules of Court, rule 5.481(a).)

---

[4] The tribes included the Cherokee Nation, the Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee Indians of Oklahoma.

Section 224.2 creates three distinct inquiry duties:  the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice.  (§ 224.2, subds. (a)-(c), (e).)  When the initial inquiry gives the juvenile court or social worker "reason to believe that an Indian child is involved" (§ 224.2, subd. (e)), the court and social worker must conduct further inquiry to "determine whether there is reason to know a child is an Indian child."  (§§ 224.2, subd. (e)(2), 224.3 [ICWA notice is required if there is a "reason to know" a child is an Indian child as defined under § 224.2, subd. (d)].)  The child welfare agency "does not discharge [its] duty of further inquiry until [it] make[s] a 'meaningful effort' to locate and interview extended family members and to contact [the Bureau of Indian Affairs] and the tribes."  (*In re K.T.* (2022) 76 Cal.App.5th 732, 744.)  If that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply.  (See § 224.2, subd. (d) [defining circumstances that establish a "reason to know" a child is an Indian child]; *In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)

On appeal, we review ICWA findings and orders for substantial evidence.  (See *In re D.S.*, *supra*, 46 Cal.App.5th at p. 1051; § 224.2, subd. (i)(2).)  The juvenile court's "fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review."  (*In re Dezi C.*, *supra*, 16 Cal.5th at p. 1141.)

C.  *Analysis*

The Agency argues, and we agree, that mother's ICWA challenge is not yet ripe for review.  " 'Ripeness' refers to the requirements of a current controversy."  (*City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, 59.)  An issue is not ripe for review unless and until it is "sufficiently concrete to allow judicial resolution even in the absence of a precise factual context."  (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170; see *id*. at pp. 170-172.)  As this court explained in *J.J. v. Superior Court* (2022) 81 Cal.App.5th 447, if the juvenile court did not yet make a final ICWA

19

ruling at or before the challenged hearing as to whether the ICWA applies to the proceeding, a parent's challenge is premature. (*J.J.*, at p. 461.) Any remarks we would make now on the adequacy of the ICWA compliance would be advisory. (See *People v. Buza* (2018) 4 Cal.5th 658, 693 ["We . . . abide by . . . a ' "cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more" ' "].)

Here, while the juvenile court did ask the parents about Indian ancestry at the initial detention hearing, and the parents and several extended relatives have denied having Indian ancestry, the court never actually made any ICWA findings at the contested jurisdiction/disposition hearing. Moreover, based on maternal grandmother's claim that she may have Cherokee ancestry, the record shows the Agency has since contacted the BIA and at least three Cherokee tribes to inquire about potential Indian ancestry. Because the case is still ongoing (as reunification services were ordered for mother and father), and it is not clear whether any of the tribes have responded to the Agency's inquiry efforts, the Agency and the juvenile court may still fulfill their affirmative and continuing duty to inquire whether the minors are Indian children. Any ICWA inquiry and notice compliance issues are thus not yet ripe for review and mother's claim of ICWA error is premature.

## DISPOSITION

The juvenile court's orders are affirmed.

/s/
Duarte, J.

We concur:

/s/
Mauro, Acting P. J.

/s/
Renner, J.

21